# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PPG INDUSTRIES, INC.,<br><br>　　　　　Plaintiff,<br>　　v.<br><br>UNITED STATES OF AMERICA;<br>UNITED STATES DEPARTMENT<br>OF COMMERCE; WILBUR ROSS, in<br>his official capacity as Secretary of<br>Commerce; and UNITED STATES<br>DEPARTMENT OF DEFENSE,<br><br>　　　　　Defendants. | Case No. 2:12-CV-03526 |

**Memorandum in Support of the United States'
Motion for Summary Judgment**

# TABLE OF CONTENTS

Table of Authorities ............................................................................ iii

Introduction ........................................................................................ 1

Statutory Background ......................................................................... 2

    I.    CERCLA ............................................................................. 2

    II.   RCRA ................................................................................. 4

Factual Background ............................................................................ 5

    I.    Overview of the Sites .......................................................... 5

    II.   Production of chromium chemicals in war and in peacetime .............. 8

        A.    World War I ............................................................. 8

        B.    Interwar period and World War II ................................ 8

            1.    Government stockpiling and sale of chromite ore ........... 8

            2.    Government orders regarding chromium ........................ 9

            3.    Labor shortages .............................................. 10

            4.    Proposals to increase production of chromium chemicals ........................................................ 10

        C.    Postwar period ........................................................ 12

        D.    PPG's acquisition of Natural Products in 1954 and subsequent operations ............................................. 12

    III.   PPG's cleanup of the Sites ................................................. 13

    IV.   This litigation .................................................................. 14

Standard of Review ............................................................................ 15

i

Argument ............................................................................................................... 15

I.      There is no evidence that the United States is liable under
        CERCLA. ............................................................................................ 15

        A.      The United States is not liable as an operator .......................... 16

        B.      The United States is not liable as an arranger .......................... 21

                1.      The United States did not own or possess the
                        Chromium Waste. ......................................................... 22

                2.      The United States never took intentional steps to
                        dispose of the Chromium Waste. .................................. 23

II.     PPG cannot meet its burden of demonstrating that it has
        incurred necessary response costs consistent with the National
        Contingency Plan. ............................................................................... 25

III.    The Court should enter partial summary judgment as to PPG's
        liability on the United States' contribution counterclaim. .................. 29

IV.     There is no evidence that the United States is liable under
        RCRA. ................................................................................................. 32

Conclusion ............................................................................................................ 33

# TABLE OF AUTHORITIES

## Cases

*Agere Systems, Inc. v. Advance Envtl. Tech. Corp.*,
   602 F.3d 204 (3d Cir. 2010) ................................................................30

*Amland Props. Corp. v. Aluminum Co. of Am.*,
   711 F. Supp. 784 (D.N.J. 1989).................................................... 28, 29

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ............................................................................15

*B.F. Goodrich Co. v. Murtha*,
   958 F.2d 1192 (2d Cir. 1992) ...............................................................5

*Burlington N. & Santa Fe Ry. Co. v. United States*,
   556 U.S. 599 (2009) .............................................................. 3, 23, 24

*Chevron Mining Inc. v. United States*,
   863 F.3d 1261 (10th Cir. 2017).........................................................22

*Coeur D'Alene Tribe v. Asarco Inc*.,
   280 F. Supp. 2d 1094 (D. Idaho 2003), *modified in part sub. nom.*
   *United States v. Asarco, Inc.,* 471 F. Supp. 2d 1063 (D. Idaho 2005) .......... 18, 20

*Cooper Indus., Inc. v. Aviall Servs., Inc.*,
   543 U.S. 157 (2004) .......................................................................4, 25

*Doeblers' Pa. Hybrids, Inc. v. Doebler*,
   442 F.3d 812 (3d Cir. 2006) ...............................................................15

*Exxon Mobil Corp. v. United States*,
   108 F. Supp. 3d 486 (S.D. Tex. 2015)......................................... 18, 21

*FMC Corp. v. U.S. Dep't of Commerce*,
   29 F.3d 833 (3d Cir. 1994) .................................................................21

*Geraghty & Miller, Inc. v. Conoco Inc.*,
  234 F.3d 917 (5th Cir. 2000), *abrogated on other grounds by*
  *Burlington*, 556 U.S. at 599 ................................................................................16

*Hinds Invs., LP v. Angioli*,
  654 F.3d 846 (9th Cir. 2011) ................................................................................32

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*,
  263 F. Supp. 2d 796 (D.N.J. 2003), *aff'd*, 399 F.3d 248 (3d Cir. 2005).............32

*Lockheed Martin Corp. v. United States*,
  35 F. Supp. 3d 92 (D.D.C. 2014),
  *aff'd*, 833 F.3d 225 (D.C. Cir. 2016) ....................................................... 20, 21, 31

*Lockheed Martin Corp. v. United States*,
  833 F.3d 225 (D.C. Cir. 2016) ..............................................................................31

*Meghrig v. KFC W., Inc.*,
  516 U.S. 479 (1996) .............................................................................................4, 5

*Miami-Dade Cty., Fla. v. United States*,
  345 F. Supp. 2d 1319 (S.D. Fla. 2014) ........................................................... 20, 21

*Morton Int'l, Inc. v. A.E. Staley Mfg. Co.*,
  343 F.3d 669 (3d Cir. 2003) ..................................................................................22

*Nopco Chem. Div. v. Blaw-Knox Co.*,
  59 N.J. 274 (N.J. 1971)..........................................................................................19

*Swift Canadian Co. v. Banet*,
  224 F.2d 36 (3d Cir. 1955) ....................................................................................19

*Union Pac. R.R. Co. v. Reilly Indus., Inc.*,
  215 F.3d 830 (8th Cir. 2000)..................................................................................28

*United States v. Atl. Research Corp.*,
  551 U.S. 128 (2007) .................................................................................................4

*United States v. Bestfoods*,
  524 U.S. 51 (1998) .................................................... 2, 16, 17, 18, 20, 21

*Vine Street LLC v. Borg Warner Corp.*,
   776 F.3d 312 (5th Cir. 2015) .................................................................................24

**Statutes**

42 U.S.C. §§ 6901-92k ..........................................................................................4

42 U.S.C. § 6902(b) ...............................................................................................5

42 U.S.C. § 6972(a)(1)(B) .................................................................................5, 32

42 U.S.C. §§ 9601-75............................................................................................2

42 U.S.C. § 9601(9) ...............................................................................................3

42 U.S.C. § 9601(14) .............................................................................................5

42 U.S.C. § 9601(14)(B) ........................................................................................5

42 U.S.C. § 9601(20)(A)(ii) ..................................................................................16

42 U.S.C. § 9601(23) ...........................................................................................25

42 U.S.C. § 9601(24) ...........................................................................................25

42 U.S.C. § 9601(25) ...........................................................................................25

42 U.S.C. § 9607(a) ..................................................................................... 3, 27, 29

42 U.S.C. § 9607(a)(1)-(4)......................................................................................3

42 U.S.C. § 9607(a)(2).....................................................................................16, 31

42 U.S.C. § 9607(a)(3)..........................................................................................22

42 U.S.C. § 9607(a)(4)(B) ...............................................................................25, 26

42 U.S.C. § 9613(f).................................................................................................4

42 U.S.C. § 9613(f)(1) ........................................................................... 4, 14, 30, 31

42 U.S.C. § 9613(f)(3)(B) ....................................................................................4

## Rules

Fed. R. Civ. P. 56(a) .........................................................................................15

## Code of Federal Regulations

40 C.F.R. pt. 300 ...............................................................................................25

40 C.F.R. § 300.155(c) ................................................................................ 26, 28

40 C.F.R. § 300.415(n)(2) .................................................................................27

40 C.F.R. § 300.415(n)(3)(ii) ................................................................. 26, 27, 28

40 C.F.R. § 300.415(n)(4) .................................................................................27

40 C.F.R. § 300.430(c)(2) .................................................................................28

40 C.F.R. § 300.430(c)(2)(ii) ...................................................................... 26, 27

40 C.F.R. § 300.430(c)(6)(i)-(v) .......................................................................26

40 C.F.R. § 300.430(f)(3) .................................................................................27

40 C.F.R. § 300.435(c)(1) ........................................................................... 26, 27

40 C.F.R. § 300.700(c)(3)(i) ....................................................................... 25, 27

## INTRODUCTION

About a hundred years ago, a stretch of Garfield Avenue in Jersey City became the site of a factory that produced chromium chemicals used in industrial processes ranging from metal treatment to dye manufacture.  The factory churned out chromium chemicals through two world wars and in the years that followed.  Plaintiff PPG acquired the site in 1954 and continued chromium-chemical production there for nearly a decade.

Useful as chromium was to industrial activities, it is also hazardous.  The manufacturing process generated chromium waste, which was dumped in large piles around the factory and which leached chromium into the soil and groundwater.  PPG also sold or gave away a great deal of that waste for use in construction around Hudson County.  Eventually, the state of New Jersey investigated the factory and nearby sites where the chromium waste ended up.  In 1990 and again in 2009, the state entered into settlement agreements with PPG to resolve the latter's alleged violations of various pollution laws.  As part of the settlements, PPG agreed to clean up the sites.

In 2012 PPG, looking to split cleanup costs with somebody, sued the United States, claiming that the government is liable under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA).  PPG also

claims that the United States is liable under the Resource Conservation and Recovery Act (RCRA) and must itself perform cleanup work.

But PPG has sued in vain.  Five years of discovery have uncovered no evidence that the United States is liable under CERCLA or RCRA:  The government never owned the sites or anything else there, least of all any chromium waste; never controlled any aspect of waste-related or other site operations; never, in short, had anything to do with the waste or the sites.  Absent any genuine issue of its liability, the United States is entitled to summary judgment.

In any event, because PPG did not comply with CERCLA's cleanup procedures, its past costs are not recoverable under that statute.  This Court should therefore grant summary judgment for the United States as to those costs.  Alternatively, because there is no question that PPG is liable, the Court should enter partial summary judgment as to PPG's liability on the United States' counterclaim.

## STATUTORY BACKGROUND

### I.   CERCLA

Congress enacted CERCLA, 42 U.S.C. §§ 9601-75, "in response to the serious environmental and health risks posed by industrial pollution." *United States v. Bestfoods*, 524 U.S. 51, 55 (1998).  The statute was designed "to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such

cleanup were borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009) (internal quotation marks omitted).

To that end, CERCLA holds four classes of potentially responsible parties (often called PRPs) liable for cleanup costs.  They are: (1) owners and operators of vessels or facilities;[1] (2) persons who formerly were owners and operators of a facility at the time a hazardous substance was disposed of there; (3) persons who arrange for disposal or treatment of hazardous substances, or arranged with a transporter for transport of hazardous substances for disposal or treatment; and (4) persons who accept hazardous substances for transport for disposal or treatment at facilities, vessels, or sites selected by such persons.  42 U.S.C. § 9607(a)(1)-(4). PPG alleges that the United States is liable as an operator and arranger.  First Amended Compl., ECF No. 16, at ¶¶ 66-67, 71-72.

CERCLA provides two "clearly distinct" types of legal actions through which PRPs can be held liable for cleanup costs: (1) actions for cost recovery under Section 107(a), 42 U.S.C. § 9607(a); and (2) actions for contribution under

---

[1] "Facility" is defined broadly as "(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel." 42 U.S.C. § 9601(9).

Section 113(f), *id.* § 9613(f).  *See Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543

U.S. 157, 163 & n.3 (2004).  Cost recovery under Section 107(a) is available to

liable parties who voluntarily fund and perform a cleanup action.  *See United*

*States v. Atl. Research Corp.*, 551 U.S. 128, 139 & n.6 (2007).  In contrast, Section

113(f) grants a PRP a right to contribution either (1) "during or following" a suit

under CERCLA Section 106 or 107, 42 U.S.C. § 9613(f)(1); or (2) after it "has

resolved its liability to the United States or a State for some or all of a response

action or for some or all of the costs of such action in an administrative or

judicially approved settlement," *id.* § 9613(f)(3)(B).  *See Cooper Indus.*, 543 U.S.

at 167.

## II.    RCRA

RCRA, 42 U.S.C. §§ 6901-92k, is a "comprehensive environmental statute

that governs the treatment, storage, and disposal of solid and hazardous waste."

*Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996).  Unlike CERCLA, RCRA "is

not principally designed to effectuate the cleanup of toxic waste sites or to

compensate those who have attended to the remediation of environmental

hazards."  *Id.*  Instead, it aims to reduce the generation of hazardous waste and to

ensure the proper treatment, storage, and disposal of that waste to "minimize the

present and future threat to human health and the environment." 42 U.S.C.

§ 6902(b); *see Meghrig*, 516 U.S. at 483.[2]

RCRA's citizen-suit provision allows any person who has given the statutorily required notice to sue the United States if it "has contributed or . . . is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment[.]"  42 U.S.C.

§ 6972(a)(1)(B).

## FACTUAL BACKGROUND

### I.      Overview of the Sites

Beginning around 1915, the Natural Products Refining Corporation constructed and operated a production plant at the Garfield Avenue Site and portions of adjacent properties (Garfield Adjacent Sites, and together with the Garfield Avenue Site, the Sites), in Jersey City, Hudson County, New Jersey. Statement of Undisputed Material Facts (Facts) ¶¶ 1-2.  This aerial photograph,

---

[2] Another distinction between the two statutes is that whereas RCRA addresses solid and hazardous wastes, CERCLA addresses hazardous substances.  *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1202 (2d Cir. 1992).  CERCLA defines "hazardous substance" to include, along with other materials, all hazardous wastes regulated under subtitle C of RCRA.  *See* 42 U.S.C. § 9601(14)(B).

taken in November 1940, shows most of the Sites as to which PPG seeks to hold

the United States liable.[3]  *Id.* ¶ 9.



The plant manufactured chromium chemicals—primarily sodium bichromate but

also potassium bichromate and chromic acid—that were used in tanning-pigment

production, chromic-acid manufacture, metal treatment, textile processing, and

chemical and dye manufacture.  *Id.* ¶¶ 4, 19.  Natural Products' production process

entailed the following steps: chrome roasting, leaching, purification, and

manufacturing.  *Id.* ¶¶ 10-16.  This process generated waste containing chromium

---

[3] The Garfield Avenue Site is commonly referred to as the Hudson County
Chromate (HCC) Site 114.  Facts ¶ 8.  The Garfield Adjacent Sites are identified in
PPG's Complaint as HCC Sites 121, 132, 133, 135, 137, 143, 186, 202, and 207.
*Id.*  Site 202 is not shown in this photograph.  *Id.* ¶ 9 & n.3.  The Morris Canal,
shaded in blue, was filled by Natural Products many years ago.  *Id.* ¶ 9.

(Chromium Waste), including mud from leaching, filter cake from leachate filtering, and airborne dusts from various processes at the plant. *Id.* ¶ 20. The Chromium Waste contained both trivalent chromium and hexavalent chromium, which are hazardous substances under CERCLA. *Id.* ¶ 25.

Mud was the most voluminous form of Chromium Waste, and much of it was stockpiled at the Garfield Avenue Site and adjacent Site 137. Facts ¶¶ 20, 26, 112. Left exposed to the elements, the mud piles leached trivalent and hexavalent chromium into the soil and groundwater. *Id.* ¶ 27. In addition, PPG sold or gave away significant quantities of the mud, some of which was used at other sites in Hudson County in various construction and development projects. *Id.* ¶¶ 28-29. Chromium and other contaminants in the Chromium Waste also leached into soil and groundwater at those places. *Id.* ¶ 30.

Although the United States regulated the national economy, its involvement with the Sites was, at best, minimal. Importantly, at no point during the Sites' history did the United States own any portion of the Sites, or any of the buildings, facilities, or equipment there. Facts ¶ 32. The United States never purchased, possessed, or owned any Chromium Waste. *Id.* ¶¶ 40, 45, 85, 99, 123. In fact, the United States was never at all involved with the manufacturing process or in the handling, storage, or disposal of Chromium Waste at the Sites. *Id.* ¶¶ 38-39, 44, 98, 122. No federal employees ever worked or were stationed at the Sites. *Id.*

¶ 33.  And there is no evidence that the United States ever seized or threatened to seize the Sites.  *Id.* ¶¶ 41, 46, 57, 100, 124.

## II.     Production of chromium chemicals in war and in peacetime

### A.     World War I

In 1916 Congress authorized the President to place obligatory "orders for purchase or production" with private companies "in time of war or when war is imminent[.]"  Facts ¶ 34.  But there is no evidence that any such orders were issued to Natural Products.  *Id.*

In 1917 the United States established a priority system for the allocation of scarce resources and the manufacture of those resources into finished products.  Facts ¶ 36.  But by war's end, no agreements had been drawn up for the conservation of chromite.  *Id.*  Instead, the government had "simply requested the Trade [including chromium-chemicals producers] to do all in their power to reduce the consumption of products manufactured from chromite and the Trade agreed to exert its efforts toward this end."  *Id.*

### B.     Interwar period and World War II

#### 1.     Government stockpiling and sale of chromite ore

From the 1920s through World War II, almost all chromite ore in the United States was imported.  Facts ¶ 42.  In 1934 the government recognized that chromite ore was among many "strategic raw materials" of national interest in the event of

war.  *Id.* ¶ 47.  Six years later, it established the Metals Reserve Company for the

purpose of "buying, selling, acquiring, storing, carrying, importing, exporting,

producing, processing manufacturing and marketing of," among other things,

"critical materials" such as chromium.  *Id.* ¶¶ 49-50.

    When World War II disrupted normal supply lines, Metals Reserve bought

metals and minerals at above-market prices, stockpiled them, and sold them at

lower prices to private companies.  Facts ¶¶ 64-65.  Between June 1943 and

February 1946, Natural Products signed multiple contracts with Metals Reserve for

the purchase of chromite ore from government stockpiles.  *Id.* ¶¶ 65-67 & n.14.

Under these contracts, the ore would "be delivered f.o.b. railroad cars at Buyer's

Jersey City, New Jersey Plant."  *Id.* ¶ 70.

## 2.    Government orders regarding chromium

    In 1940 Congress again authorized the President to place obligatory "orders"

for various materials with private companies.  Facts ¶ 54.  If a company refused to

comply, the government could take immediate possession of the company's plant

and the owners faced civil and criminal penalties.  *Id.*  As in World War I, there is

no evidence that during World War II the United States ever issued any obligatory

purchase order to Natural Products, or ever took possession (or even threatened to

take possession) of Natural Products' plant.  *Id.* ¶¶ 41, 57.

Between 1941 and 1942, the government issued and amended various orders designed to conserve and direct distribution of chromium in commerce. Facts ¶¶ 58-61. These orders, however, did not direct how the ores were to be processed, or how the chromium chemicals were to be made. *Id.* ¶ 62. Nor did they address how Chromium Waste was to be handled. *Id.*

### 3.   Labor shortages

Wartime labor shortages occurred in many industries, including the chromium-chemicals industry. Facts ¶¶ 72, 76-77. In 1943 the government discussed "possibilities" of finding employment for American citizens of Japanese descent who had been relocated to segregation camps. *Id.* ¶ 73. Although some of these citizens were placed in plants in and around Chicago, Cleveland, and New York, there is no evidence that any were placed at Natural Products or that the United States was otherwise involved in labor issues at Natural Products' plant. *Id.* ¶¶ 74-75, 79.

### 4.   Proposals to increase production of chromium chemicals

In 1944 the government considered three ideas to address a shortage in chromium chemicals. Facts ¶ 80. First, it was proposed that companies would run the same chromite ore fewer times through the manufacturing process to create a higher output of sodium bichromate (which would leave more chromium in the waste sludge that would have otherwise been extracted in additional runs). *Id.*

¶¶ 80-81.  Natural Products reported that it probably could increase production "by wasteful use of chromite ore . . . but ore losses would have to be subsidized."  *Id.* ¶ 82.  To address this concern, it was thought that Metals Reserve could buy the waste sludge at a price high enough to compensate manufacturers for the uneconomic use of ore.  *Id.* ¶ 83.  But Metals Reserve rejected the sludge-purchase plan as falling outside its "sphere of activities."  *Id*. ¶ 84.  Consistent with this rejection, there is no evidence indicating that Metals Reserve, or any other federal agency, ever purchased waste sludge from Natural Products, or that any agency of the United States ever owned or possessed such waste.  *Id.* ¶ 85.

The second idea was to use higher grade, more expensive Russian ore, with the government subsidizing companies for increased costs.  Facts ¶¶ 80, 86.  In June 1944, Metals Reserve shared the idea with Natural Products and other sodium-bichromate producers.[4]  *Id.* ¶ 87.  Natural Products responded that "[w]e have no high grade ore on hand at the present time, nor do we anticipate the purchase of any unless we are compelled to do so on account of a shortage of lower grade ore."  *Id.* ¶ 88.  Consistent with this statement, there is no evidence that Natural Products ever participated in the Russian ore subsidy program.  *Id.* ¶¶ 89-90.

_____

[4] During the war, Natural Products was one of five companies that produced sodium bichromate.  Facts ¶¶ 63, 87.

The third idea to address production shortage was to expand plant capacity. Facts ¶ 80.  Although Natural Products had expressed an interest in expanding production, it ultimately decided against doing so.  *Id.* ¶¶ 91-92.

### C.     Postwar period

In the postwar years, the government continued to consider chromite ore as among a large group of critical defense materials and continued to stockpile it. Facts ¶¶ 102-03.  But there is no evidence that either the critical-defense-material designation or stockpiling affected Natural Products' operations in any way after World War II.  *Id.* ¶ 104.

### D.     PPG's acquisition of Natural Products in 1954 and subsequent operations

PPG "acquired the Garfield Avenue Site and portions of the Garfield Adjacent Sites from [Natural Products] in August 1954 and utilized them through September 1963."  First Amended Compl. ¶ 17.  During PPG's ownership and operation of the Sites, Chromium Waste was generated and disposed there.  Facts ¶¶ 7, 110-11; Ex.1, Chen Decl., Att. 2, PPG Industries, Inc.'s Answers and Objections to Plaintiff's First Set of Interrogatories (PPG's Answers to Interrogatories in *Exxon*), nos. 11, 13-15, *Exxon Corp. v. PPG Indus., Inc.*, Case No. W-001301-90 (N.J. Super. Ct. Law Div., Hudson Cty.).  PPG continued production using essentially the same Natural Products facilities, processes, and

personnel.  Facts ¶ 110.  The plant at the Garfield Avenue Site was eventually closed in 1963.  *Id.* ¶¶ 5, 121.

## III.   PPG's cleanup of the Sites

In 1990, PPG entered into an Administrative Consent Order (the 1990 Order) with New Jersey to settle alleged violations of state environmental statutes. Facts ¶ 125.  The order, which covered seven of the ten Sites listed in the First Amended Complaint,[5] required PPG to perform a comprehensive suite of response activities at those sites.  *Id.* ¶¶ 125, 127.

In 2009, PPG settled a state-court case by signing a Partial Consent Judgment (2009 Judgment) that resolved its liability to New Jersey for claims concerning the "PPG Sites" under CERCLA, RCRA, other environmental statutes, and common law.  Facts ¶ 128.  The 2009 Judgment explicitly incorporated all sites listed in the 1990 Order as well as several additional sites (and thus covered all sites listed in the First Amended Complaint).  *Id.* ¶ 129.  It required PPG to remediate those sites "under the terms of the 1990 Order."  *Id*. ¶ 131.  PPG and New Jersey also agreed that the "[2009] Judgment resolves any liability of PPG to the Plaintiffs and Jersey City under CERCLA for all response actions and costs of

---

[5] The 1990 Order addresses both "Residential Properties" and "Non-Residential Properties."  Facts ¶ 127.  The Sites at dispute here are a subset of the latter category and the "Residential Properties" described in the order are beyond the scope of this lawsuit.

such actions with respect to the PPG Sites, and further that this Consent Judgment

. . . embodies a 'judicially approved settlement' as those terms are used in Section

113(f)(3)(B) of CERCLA." *Id.* ¶ 130.

## IV.   This litigation

PPG asserts claims against the United States for cost recovery under

CERCLA Section 107(a), contribution under Section 113(f), and declaratory

judgment under Section 113(g)(2) and 28 U.S.C. §§ 2201-02 for past and future

response costs related to the Sites on grounds that the United States is liable as an

operator and arranger.  First Amended Compl. ¶¶ 62-68 (Count I, cost recovery),

69-74 (Count II, contribution), 75-78 (Count III, declaratory judgment).

PPG also asserts a claim under RCRA's citizen-suit provision, alleging that

the United States contributed to the past or present handling, storage, treatment,

transportation, or disposal of Chromium Waste in soil or groundwater at or near

the Sites based on its alleged operations or control of operations there.  *Id*. ¶¶ 79-87

(Count IV).

The United States asserts a counterclaim against PPG for contribution under

CERCLA Section 113(f)(1), 42 U.S.C. § 9613(f)(1), on grounds that PPG is a

liable party under CERCLA.  Answer to the First Amended Complaint and

Counterclaim by the United States (U.S. Answer and Counterclaim), ECF No. 19,

at 24, 26.

## STANDARD OF REVIEW

This Court should grant summary judgment for the United States if "there is no genuine dispute as to any material fact" and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Whether a fact is material turns on the governing law—here, CERCLA and RCRA—and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

As the moving party, the United States bears the burden to demonstrate the absence of any genuine issues of material fact. *Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 819-20 (3d Cir. 2006). "When determining whether there is a triable dispute of material fact, the court draws all inferences in favor of the non-moving party." *Id.* at 820 (internal quotation marks omitted). No triable issue exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. As such, "[i]f the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

## ARGUMENT

### I.     There is no evidence that the United States is liable under CERCLA.

CERCLA aims to impose the costs of cleaning up hazardous-waste sites on those responsible for the contamination. The United States is not responsible for

the Sites' chromium contamination, for it never had anything to do with either the operations that generated Chromium Waste at the Sites or the disposal of that waste. The United States is therefore neither an operator nor an arranger, and it should not be held liable under CERCLA.

### A.     The United States is not liable as an operator.

Under CERCLA, operator liability attaches to "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of[.]" 42 U.S.C. § 9607(a)(2); *see id.* § 9601(20)(A)(ii) (defining "operator" as "any person . . . operating such facility"). The Supreme Court has explained that "an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility." *Bestfoods*, 524 U.S. at 66. "To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct *operations specifically related to pollution*, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.* at 66-67 (emphasis added). "For one to be considered an operator, then, there must be some nexus between that person's or entity's control and the hazardous waste contained in the facility." *Geraghty & Miller, Inc. v. Conoco Inc.*, 234 F.3d 917, 928 (5th Cir. 2000), *abrogated on other grounds by Burlington*, 556 U.S. at 599.

16

There is no evidence that the United States ever managed, directed, or conducted operations specifically relating to pollution at the Sites, including during World War I, World War II, and the interwar period.[6]  *See Bestfoods*, 524 U.S. at 66-67; Facts ¶¶ 39, 44, 98, 122.  It never owned the Sites or any equipment used in their operations.  Facts ¶ 32.  No federal employees ever worked at or were stationed at the Sites, and none ever managed, supervised, oversaw, or conducted operations there, let alone "operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations."[7] *Bestfoods*, 524 U.S. at 66-67; Facts ¶¶ 33, 39, 44, 98, 122.  In short, nothing in the record comes close to establishing that the United States could be liable as an operator.

PPG's theory of operator liability relies on the United States' wartime regulation of the national economy.  *See, e.g.*, First Amended Compl. ¶¶ 2, 18.  But

---

[6] Although the complaint vaguely refers to the United States' conduct "during and after World War I and World War II," it makes no specific factual allegations as to U.S. actions after World War II.  *See* First Amended Compl. ¶¶ 18-56.

[7] Though there is evidence of two visits by U.S. employees to the Garfield Avenue Site, neither supports operator liability.  The first was undertaken by personnel from the Office of Price Administration during World War II to collect information relevant to wartime price regulation.  Facts ¶ 98 n.17.  The second involved a U.S. Public Health Service study of air quality around Natural Products' facility in 1949 and 1950.  *Id.* ¶ 109. There is no evidence that either visit had anything to do with the management, direction, or conduct of operations specifically relating to Chromium Waste.  *Id.* ¶¶ 98 & n.17, 122.

17

PPG cannot convert the government's general regulatory powers over the economy into evidence of U.S. control of waste activities at the Sites. *See, e.g.*, *Exxon Mobil Corp. v. United States*, 108 F. Supp. 3d 486, 521-22 (S.D. Tex. 2015) (rejecting argument that government's wartime regulation of petroleum industry gives rise to operator liability and noting that "*Bestfoods* clearly requires more than general influence over the economy or over a plant's operations, even if the result could increase waste production."); *Coeur D'Alene Tribe v. Asarco Inc*., 280 F. Supp. 2d 1094, 1127-30 (D. Idaho 2003) (United States not deemed operator despite wartime economic regulations and "joint undertaking in which the federal government controlled certain key elements of the process of producing the necessary metals."), *modified in part sub nom. United States v. Asarco Inc.*, 471 F. Supp. 2d 1063 (D. Idaho 2005). Nor is there any evidence that the United States ever issued mandatory orders to Natural Products, ever meddled in company employee matters, or ever seized—or even threatened to seize—the Sites. Facts ¶¶ 34, 41, 44, 46, 57, 75, 79, 98, 100, 104, 106, 122, 124. The mere existence of regulatory authority, without more, is not enough to transform the United States into an operator under CERCLA. *See, e.g.*, *Exxon*, 108 F. Supp. 3d at 524 (collecting cases holding that unexercised seizure power is not grounds for operator liability); *see generally* First Amended Compl. ¶¶ 18-56.

If anything, the evidence confirms that any interaction that the United States had with Natural Products never touched on waste activities.  In particular, the government's ore sales to Natural Products were governed by contracts naming Natural Products as the "Buyer" and specifying that the ore would "be delivered f.o.b. railroad cars at Buyer's Jersey City, New Jersey Plant."  Facts ¶¶ 67 & n.14, 70.  Under the "f.o.b." clause, ownership in the ore transferred from the United States to Natural Products at the time of delivery in Jersey City.  *Id.* ¶ 70; *see Swift Canadian Co. v. Banet*, 224 F.2d 36, 38 (3d Cir. 1955) (explaining "F.O.B." provision); *Nopco Chem. Div. v. Blaw-Knox Co.*, 59 N.J. 274, 278-79 (N.J. 1971). That is, the United States' role in these transactions, along with its ore ownership, ended the moment the railroad car reached Natural Products' Jersey City plant, a point that is many steps removed from the generation of the Chromium Waste and even further removed from the disposal of that waste.  Facts Section I.B & C.

And though the government discussed with producers of chromium chemicals possible ways to increase production, nothing ever came of those discussions as the United States rejected one proposal and Natural Products declined to participate in the other two.  Facts ¶¶ 80-92.  These discussions and proposals thus had no impact on Natural Products' manufacturing operations or waste activities at the Sites.

Notably, other courts have refused to hold the United States liable as an operator notwithstanding far more extensive government involvement. For example, the United States was not held liable as an operator during World War II at certain Idaho mines and mills even when it knew about their disposal methods, received monthly operating reports from them, financed exploration of new sources of metals, threatened seizure of mining operations, and controlled wages of mining personnel. *See Coeur D'Alene Tribe*, 280 F. Supp. 2d at 1094. Likewise, the United States' conduct fell short of the *Bestfoods* standard for operator liability notwithstanding its "pervasive influence over general activities" at production facilities where the government, among other things, approved disposal processes and issued recommendations as to the safe handling, storage, and transportation of waste before disposal. *See Lockheed Martin Corp. v. United States*, 35 F. Supp. 3d 92, 144-50 (D.D.C. 2014), *aff'd*, 833 F.3d 225 (D.C. Cir. 2016);[8] *see also Miami-Dade Cty. Fla. v. United States*, 345 F. Supp. 2d 1319, 1340-46 (S.D. Fla. 2014) (United States not liable as operator of an airport even though government quality-assurance personnel had frequented the site).

---

[8] Though the parties in *Lockheed* stipulated to liability, the court analyzed operator liability under *Bestfoods* in allocating costs because it is "helpful in delineating the *types of control*" and "thus which party should be *more* responsible as an equitable matter." 35 F. Supp. 3d at 144.

Finally, the Third Circuit's decision in *FMC Corp. v. U.S. Department of Commerce* cannot help PPG.  *See* 29 F.3d 833 (3d Cir. 1994) (en banc).  There, the court held the United States liable as an operator on a theory that was later rejected by the Supreme Court.  *See id.* at 843; *Bestfoods*, 524 U.S. at 66-67.  It is therefore *Bestfoods*, not *FMC*, that controls.[9]  In any event, in *FMC* the United States had substantial, "day-to-day" control because it determined what the facility would produce, built and directed others to build plants that supplied raw materials for the manufacturing process, owned and supplied equipment used in that process, arranged to increase the labor force and supervised employee conduct, and more. *See* 29 F.3d at 836-37, 843-45.  That is worlds away from this case, where the United States had absolutely no control over waste and other operations at the Sites.  This Court should therefore hold that the United States is not liable as an operator.

### B.     The United States is not liable as an arranger.

To be liable as an arranger under CERCLA, the United States must have owned or possessed a hazardous substance and taken intentional steps to dispose of that substance.  There is not a shred of evidence that it did either.

---

[9] Several courts have questioned whether *FMC* survives *Bestfoods*.  *See Exxon*, 108 F. Supp. 3d at 521, 527; *Lockheed*, 35 F. Supp. 3d at 148 & n.77; *Miami-Dade Cty.*, 345 F. Supp. 2d at 1342.

### 1. The United States did not own or possess the Chromium Waste.

CERCLA provides that "any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by another party or entity" may be held liable as an arranger.  42 U.S.C. § 9607(a)(3).  Although this provision is not crystal clear about who must satisfy the ownership requirement, the Third Circuit has held that it is the would-be arranger who must have owned or possessed the hazardous substance.  *See Morton Int'l, Inc. v. A.E. Staley Mfg. Co.*, 343 F.3d 669, 677-78 (3d Cir. 2003); *see also Chevron Mining Inc. v. United States*, 863 F.3d 1261, 1282-83 (10th Cir. 2017) (explaining why the Third Circuit's reading is the right one, and collecting cases embracing that reading).

PPG has unearthed no evidence that the United States ever owned or possessed the Chromium Waste.  *See* Facts ¶¶ 40, 45, 85, 99, 123.  To the contrary, the evidence shows that, when presented with a proposal to increase production that also called for government purchase of waste, the United States quickly rejected the proposal as outside its "sphere of activities."  *Id.* ¶¶ 81-84.  Without having owned or possessed waste, the United States cannot be liable as an arranger.

### 2.   The United States never took intentional steps to dispose of the Chromium Waste.

The Supreme Court has clarified that arranger liability requires intent to dispose of the hazardous substance.  *See Burlington*, 556 U.S. at 599.  "[S]uch liability may not extend beyond the limits of the statute itself."  *Id.* at 610.  Those limits, in turn, depend on intent because "[i]n common parlance, the word 'arrange' implies action directed to a specific purpose[.]"  *Id.* at 611.  Thus, the Supreme Court held, "under the plain language of the statute, an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance."  *Id.*  That intent must be specific as to the disposal, meaning that the entity must have entered into the transaction "with the intention that at least a portion of the product be disposed of[.]"  *Id.* at 612.  In that case, Shell Oil had arranged for delivery of pesticides knowing that the pesticide sometimes spilled onto the ground when transferred to bulk storage at the final destination.  *Id.* at 603.  But the Supreme Court refused to hold Shell Oil liable as an arranger because "knowledge alone" that waste would be disposed of "is insufficient to prove that an entity 'planned for' the disposal [of hazardous substances], particularly when the disposal occurs as a peripheral result of the legitimate sale of an unused, useful product."  *Id.* at 612.

Like Shell Oil, the United States lacked the requisite intent here:  There is no evidence that the United States—either in its ore sales to Natural Products or in its

23

other interactions with the company—ever planned for the disposal of hazardous substances at the Sites, or ever handled the Chromium Waste or gave any instructions on the handling of that waste. *See* Facts ¶¶ 38-39, 44, 62, 98, 122. At best, the evidence shows that during World War II, the government considered— and swiftly rejected—a proposal to increase production that would result in significant quantities of sludge. *Id.* ¶¶ 83-84. But mere consideration of a proposal does not supply the necessary intent under *Burlington*. *See* 556 U.S. at 612 (knowledge alone that waste would be disposed is insufficient). Viewed against the backdrop of the government's war efforts, this evidence demonstrates that the United States was thinking about ways to increase production, not about waste disposal as such. *See Vine Street LLC v. Borg Warner Corp.*, 776 F.3d 312, 318-19 (5th Cir. 2015) ("when we view the business relationship . . . as a whole, it is clear that the transaction centered around the successful operation of a dry cleaning business—not around the disposal of waste.").

In sum, because the United States never owned or possessed the Chromium Waste and because it never took "intentional steps to dispose of" that waste, *Burlington*, 556 U.S. at 611, it is entitled to summary judgment that it is not liable as an arranger.

## II.     PPG cannot meet its burden of demonstrating that it has incurred necessary response costs consistent with the National Contingency Plan.

For reasons discussed in the preceding section, there is no evidence that the United States is liable under CERCLA, and PPG's claims should therefore be dismissed on summary judgment. But even if the Court somehow finds that there are issues of material fact as to operator or arranger liability, the United States is entitled to summary judgment as to PPG's past-cost claims because PPG cannot demonstrate that its costs are recoverable under CERCLA.

Under CERCLA, a private party may recover only "necessary costs of response incurred . . . consistent with the national contingency plan[.]" 42 U.S.C. § 9607(a)(4)(B). Promulgated by the Environmental Protection Agency under CERCLA Section 105, the National Contingency Plan specifies procedures for conducting response actions.[10] *See* 42 U.S.C. § 9607(a)(4)(B); *Cooper Indus.*, 543 U.S. at 161 & n.2; *see generally* 40 C.F.R. pt. 300. PPG bears the burden of demonstrating that its response action, "when evaluated as a whole, is in substantial compliance" with certain enumerated procedures. 40 C.F.R. § 300.700(c)(3)(i). There is no genuine issue that PPG failed to substantially comply with, at a minimum, the National Contingency Plan's public-participation

---

[10] CERCLA contemplates two broad categories of environmental cleanup actions: "removal" and "remedial" actions. *See* 42 U.S.C. § 9601(23), (24). Collectively, these actions are called "response" actions. *Id.* § 9601(25).

process.  Because it has not incurred costs "consistent with the national

contingency plan" within the meaning of Section 107, PPG cannot recoup those

costs.[11]  42 U.S.C. § 9607(a)(4)(B).

     The National Contingency Plan's public-participation provisions are

"intended to promote active communication between communities affected by

discharges or releases and the [party] responsible for response actions."  40 C.F.R.

§ 300.155(c); *see id.* § 300.700(c)(6)(i)-(v) (subjecting private parties undertaking

response actions to public-participation provisions).  To be consistent with the

National Contingency Plan, a private party like PPG should, among other things,

(1) prepare a community-relations plan that specifies the community-relations

activities that it expects to undertake during the response;[12] and, perhaps more

---

[11] Although the absence of public participation is the most glaring flaw, the United States does not concede that PPG's response costs were otherwise necessary response costs incurred consistent with the National Contingency Plan, and reserves the right to otherwise challenge the recoverability of PPG's costs should any of PPG's claims survive summary judgment.

[12] *See* 40 C.F.R. § 300.415(n)(3)(ii) (for removal actions lasting more than 120 days); *id.* § 300.430(c)(2)(ii) (before field work for remedial investigation); *cf. id.* § 300.435(c)(1) (before starting remedial design, review plan to determine whether to add descriptions of further public involvement during remedial design / remedial action).

critically, (2) give the public at least 30 days to comment on the selection of the response action and respond to significant comments.[13]  PPG did neither.

Although PPG began response actions in the early 1980s, it did not reach out to the public *at all* until 2007.  Facts ¶¶ 133, 137.  Granted, some documents predating 2007 address community-relations activities as part of remedial-investigation plans.  *Id.* ¶¶ 133-34.  But even assuming that PPG made some *plans* to engage in community relations, there is no evidence that it *actually* did so until 2007, when it established a public information center.  *Id.* ¶ 137.  Thus, PPG's pre-2007 response actions are not in substantial compliance with the National Contingency Plan's public-participation provisions.  *See* 40 C.F.R. § 300.700(c)(3)(i).  For that reason, those costs were not "consistent with" that Plan and are not recoverable under CERCLA.  *See* 42 U.S.C. § 9607(a).

As for the outreach efforts themselves, they bear little resemblance to what the National Contingency Plan describes.  There is no evidence that PPG ever prepared a formal community-relations plan for any Site at any stage of the cleanup.  *See* 40 C.F.R. §§ 300.415(n)(3)(ii), 300.430(c)(2)(ii), 300.435(c)(1); Facts ¶ 134.  The only evidence of a written plan for community relations does not address how the public would be involved in the decisionmaking process for the

---

[13] *See* 40 C.F.R. § 300.415(n)(2) & (n)(4) (before removal activities begin); *id.* § 300.430(f)(3) (for proposed remedy selection).

relevant response action to be taken, which in large part is the point of community-relation plans. Facts ¶ 135; 40 C.F.R. §§ 300.415(n)(3)(ii), 300.430(c)(2); *see also id.* § 300.155(c).

Even more significant is the absence of any opportunity for the public to comment on the selection of a response action. Facts ¶¶ 143, 145. All that PPG did was notify the community of what had *already* been decided at the Sites and answered questions about those decisions. *Id.* ¶¶ 139-43, 145. That is, instead of (as consistent with the National Contingency Plan) inviting the public's feedback on a *proposed* course of action, PPG simply presented response-action decisions as a done deal. *See* 40 C.F.R. § 300.155(c); *Union Pac. R.R. Co. v. Reilly Indus., Inc.*, 215 F.3d 830, 837 (8th Cir. 2000) (no substantial compliance where "[a]lthough the public was given an opportunity to ask questions about the nature and effects of the [response action], there was no indication that the *selection* of the response action was open to discussion or change.").

New Jersey's involvement in the cleanup process, moreover, does not cure the absence of a public comment period. After all, "the [National Contingency Plan] itself mandates that, even when a cleanup is being conducted by EPA or a state agency such as [the New Jersey Department of Environmental Protection], a public comment period be implemented." *Amland Props. Corp. v. Aluminum Co. of Am.*, 711 F. Supp. 784, 801 (D.N.J. 1989). Here, there is simply no evidence

28

that the state itself meaningfully engaged the public.  Facts ¶ 144.  Critically, like

PPG, New Jersey never invited the public to comment on proposed response

actions at the Sites.  *Id.* ¶¶ 143-44; *see Amland*, 711 F. Supp. at 801 ("because the

cleanup was a result of negotiations between [New Jersey] and [the PRP], rather

than the result of a duly promulgated (and therefore commented upon) state

regulation, the public had no opportunity to comment on either the cleanup

standard or the remedial methods to be employed.").

In the end, PPG's belated community-relations efforts, which fall far short of

the National Contingency Plan's public-participation process, cannot make up for

the company's failure to engage the public during the decades of cleanup.  Because

its actions related to public participation were not consistent with the National

Contingency Plan, PPG cannot recoup its past response costs.

## III.   The Court should enter partial summary judgment as to PPG's liability on the United States' contribution counterclaim.

Even if any portion of PPG's claim somehow survives summary judgment,

and even if the Court finds at a later stage of these proceedings that PPG has met

its burdens of demonstrating (1) that the United States is liable under CERCLA,

and (2) that PPG has incurred "necessary costs of response . . . consistent with the

national contingency plan," 42 U.S.C. § 9607(a), PPG will not be entitled to

recoup all those costs from the government.  For one thing, PPG resolved its

CERCLA liability to New Jersey in the 2009 Judgment.  That Judgment, which

required certain response actions by PPG at all the Sites, expressly triggered a

contribution claim under Section 113(f)(3)(B):

> [T]his Consent Judgment resolves any liability of PPG to the Plaintiffs
> [including New Jersey] under CERCLA for all response actions and costs of
> actions with respect to the PPG Sites, and . . . embodies a "judicially
> approved settlement" as those terms are used in Section 113(f)(3)(B) of
> CERCLA[.]

Facts ¶ 130.  Under controlling Third Circuit law, that contribution claim is PPG's

exclusive remedy to recoup response costs incurred pursuant to the Judgment.  *See*

*Agere Systems, Inc. v. Advance Envtl. Tech. Corp.*, 602 F.3d 204, 227-29 (3d Cir.

2010); First Amended Compl. ¶¶ 69-74 (asserting contribution claim).  PPG could

therefore recoup those costs only to the extent that it expended more than its

equitable share.

PPG has also, however, filed a Section 107(a) cost-recovery claim against

the United States, as to which the government has asserted a contribution

counterclaim under CERCLA Section 113(f)(1) based on PPG's own CERCLA

liability.  *See* First Amended Compl. ¶¶ 62-68; U.S. Answer and Counterclaim, at

24-26; 42 U.S.C. § 9613(f)(1) ("during or following" action under Section 107(a),

a party may seek contribution from "any other person who is liable" under

CERCLA).  There is simply no genuine issue that PPG itself is liable under

CERCLA:  PPG has admitted to holding title to the Garfield Avenue Sites and

portions of the Garfield Adjacent Sites between 1954 and 1963.  First Amended

Compl. ¶ 17.  It has admitted to processing chromium during that period.  Facts

¶¶ 7, 110-11; PPG's Answers to Interrogatories in *Exxon*, nos. 11, 13-15.  And it

has admitted that chromium residue from its operations was stored on site.  *Id*.

That makes PPG, at a minimum, a person "who at the time of disposal of any

hazardous substance owned or operated any facility at which such hazardous

substances were disposed of" and therefore a liable party.[14]  42 U.S.C.

§ 9607(a)(2).

     Any recovery by PPG would thus be limited to amounts it has paid in excess

of its fair share at the Sites, which the Court would be called on to allocate "using

such equitable factors as the court determines are appropriate."[15]  42 U.S.C.

§ 9613(f)(1); *see, e.g.*, *Lockheed Martin Corp. v. United States*, 833 F.3d 225, 234

(D.C. Cir. 2016).  To be clear, the United States is not seeking summary judgment

on allocation; even if it were liable, allocation is a complex and fact-intensive

process.  The Court should, however, enter partial summary judgment for the

---

[14] The United States seeks summary judgment only as to PPG's liability as a
CERCLA owner and operator.  If, however, any portion of PPG's claims survives
summary judgment, the United States reserves the right to assert other bases for
PPG's CERCLA liability, including in any allocation proceeding.  *See Lockheed*,
35 F. Supp. 2d at 144 (noting potential significance of nature of CERCLA liability
to equitable allocation).

[15] Any such allocation would properly reflect the fact that U.S. involvement with
the generation and disposal of Chromium Waste was not merely limited—it was
nonexistent.  *See supra* at Argument Section I.

United States on its counterclaim, and hold that PPG is itself liable and must bear its own fair share of cleanup costs.

## IV.   There is no evidence that the United States is liable under RCRA.

A party is liable under RCRA's citizen-suit provision if it has, among other things, "contributed or . . . is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment[.]" 42 U.S.C. § 6972(a)(1)(B).

"[T]he plain language of [that provision] makes clear that liability should only be imposed on those who actively manage or dispose solid or hazardous waste." *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 263 F. Supp. 2d 796, 831 (D.N.J. 2003), *aff'd*, 399 F.3d 248 (3d Cir. 2005); *see Hinds Invs., LP v. Angioli*, 654 F.3d 846, 851 (9th Cir. 2011) (Section 6972(a)(1)(B) "requires that a defendant be actively involved or have some degree of control over the waste disposal process to be liable under RCRA.").  There is no evidence at all that the United States ever had anything to do with the Chromium Waste at the Sites, let alone that it had the kind of active involvement with waste demanded by RCRA. *See* facts discussed *supra* Argument Section I; 42 U.S.C. § 6972(a)(1)(B) (requiring contribution to "handling, storage, treatment, transportation, or disposal of any solid or hazardous waste").

With no genuine issue as to these material facts, this Court should grant summary judgment that the United States is not liable under RCRA.

## CONCLUSION

This case presents a textbook example of claims that warrant summary judgment, textbook because there is no triable dispute of the material facts needed to hold the United States liable under CERCLA and RCRA.  The United States simply had nothing to do with Chromium Waste at the Sites, and PPG cannot establish liability by pointing to the government's wartime regulation of the national economy.  Neither can PPG show that any of its past costs are recoverable.  This Court should therefore grant the United States' motion.

Respectfully submitted,

Dated: February 28, 2018

Jeffrey H. Wood
*Acting Assistant Attorney General*

    */s/ Sue Chen*
John E. Sullivan
*Senior Trial Counsel*
Sue Chen
Tsuki Hoshijima
*Trial Attorneys*
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
202.305.0283
sue.chen@usdoj.gov