UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PPG INDUSTRIES, INC.,<br><br>   Plaintiff,<br> v.<br><br>UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF COMMERCE; WILBUR ROSS, in his official capacity as Secretary of Commerce; and UNITED STATES DEPARTMENT OF DEFENSE,<br><br>   Defendants. | Case No. 2:12-CV-03526 |

**UNITED STATES' REPLY IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**I.  PPG distorts the historical record.**...................................................................1

    A.    The United States did not control the Natural Products plant.......................1

    B.    There is no evidence of a wartime manufacturing process change, let alone United States involvement in effecting such change. ...................................3

**II.  PPG cannot meet its burden of demonstrating that it has incurred necessary response costs consistent with the National Contingency Plan.**
..................................................................................................................6

**III.  PPG gives no reason why the United States expert opinions should not be considered.**..........................................................................................8

PPG's history of the Sites is largely baseless speculation — not, as PPG claims, inferences that can be reasonably drawn from the factual record. This reply highlights key problems with PPG's factual narrative and legal issues newly raised in PPG's opposition brief. As to any issues not addressed herein, the United States rests on its prior briefing.

## I. PPG distorts the historical record.

### A. The United States did not control the Natural Products plant.

PPG stretches far beyond the factual record with its statement that Natural Products "lost complete control of its plant to the Government" during World War II. PPG Opp. (ECF No. 169) at 7. There is no evidence of such government control.

First, though the United States sold stockpiled chromite ore to Natural Products, the United States did not control use of the ore post-delivery. U.S. Facts (ECF No. 152-1) ¶¶ 65-67, 70. PPG claims that the United States priced the ore to make a profit at the expense of private industry, PPG Opp. at 7, 10–11; those facts are in dispute, U.S. Resp. Facts (ECF No. 168) ¶¶ 44, 47, but in any event, any such profit did not lead to control over the plant's waste disposal processes and is immaterial to CERCLA liability.

Second, the United States did not control the Natural Products plant through its alleged involvement in labor issues. For one thing, there is no evidence of any

such involvement.  U.S. Facts ¶¶ 74–75 & n.16.  PPG observes that the United States supplied labor to *other* factories and on that basis speculates that "there is no reason to believe that available workers were not also provided to" Natural Products.  PPG Opp. at 15.  Even if that were not mere speculation by PPG, mere supply of labor — without accompanying control over waste disposal processes — is immaterial to CERCLA liability.

PPG also argues that the United States' alleged control over the plant "necessitated many visits" to the plant by federal employees — and that those supposed "many visits" prove that the United States controlled the plant.  PPG Opp. at 8–9.  Not only is this argument wholly circular, but it is unsupported by the factual record.  In fact, there is scant evidence of the presence of federal employees at the plant.  U.S. Facts ¶ 98 & n.17.

Finally, while the United States did control prices and allocation of Natural Products' output, the United States never mandated production of any quantity of chromium.  *Id.* ¶ 57.  PPG's assertion of "production quotas," PPG Opp. at 7, lacks record support.  To the limited extent that the United States purchased from the plant, the United States is not liable under CERCLA as a customer in a voluntary market transaction.[1]

---

[1]   The United States' settlement agreement to resolve its CERCLA liability for response costs at a facility formerly owned by the Martin Dennis Company, PPG Opp. at 20-21, is not evidence of any U.S. control of operations at the Natural

2

### B. There is no evidence of a wartime manufacturing process change, let alone United States involvement in effecting such change.

There is no evidence that during World War II, Natural Products switched to an alternative production process to increase output by running ore through the plant only once. A change to such a process was proposed around February 1944, U.S. Facts ¶ 81, but there is no evidence that the proposal was implemented, let alone evidence that the United States either demanded or subsidized such a switch.

Lacking direct evidence that Natural Products ever switched to the alternative process, PPG attempts to draw an inference from the use of lime, based on the premise that the alternative process involved "large amounts of lime." PPG Opp. at 23. But the evidence on lime usage does not line up with when PPG claims the alternative process was adopted. The alternative process was proposed in 1944. U.S. Facts ¶¶ 80-84; PPG Facts (ECF No. 153-3) ¶¶ 84, 90. But lime was used at the Natural Products plant well before 1944, and well after the end of the war. U.S. Ex. 21 (ECF No. 152-13), at PPGNPR0634466 (1956 PPG report reporting use of lime "approximately twenty years ago," i.e. the mid-1930s); PPG Opp. at 18 (claiming lime use "in the very late 40s through 1950"); U.S. Resp. Facts ¶ 128 (aerial photographs show light-toned piles of waste material, indicating

---

Products plant. *Cf.* Fed. R. Evid. 408. In any event, the Martin Dennis plant is factually distinguishable because of the government ownership of some of the equipment at that plant; there is no such allegation in this case. PPG Opp. at 21.

use of lime, near the plant from 1940 to 1954, with light-toned piles increasing in size from 1947 to 1951). Evidence of the use of lime before 1944 and after the war undermines PPG's theory that the use of lime necessarily indicated a wartime use of an alternative process that would have ordinarily been economically infeasible.

PPG further attempts to reason that Natural Products must have switched to the alternative process because it managed to increase production without expanding the plant or using higher-grade ore. PPG Opp. at 16–19. But in fact, the increase in production in the fourth quarter of 1944 was marginal and Natural Products' production in the third quarter of 1944 actually fell compared to the first and second quarters. PPG Ex. 74 (ECF No. 158-19) at PPGNPR0015820–21. Even if production had increased, moreover, it would be sheer speculation to attribute that increase to a changed process when there is no evidence that such a change occurred.

Even if some change did occur in Natural Products' production process, there is no evidence that the United States coerced that change. PPG points to Bernard Baruch's statement about World War I price controls being based on the threat of seizure and the fact that another chromium plant was seized during World War II in response to a labor strike. PPG Opp. at 5–6. But neither of those facts supports a reasonable inference that the United States used the threat of seizure to dictate the manufacturing process used at any plant; nor is there any evidence that

4

the United States ever actually threatened Natural Products with seizure for any reason.

PPG argues alternatively that the United States subsidized a process change. PPG acknowledges that there is evidence that the Metals Reserve Corporation declined a proposal in which it would have subsidized a change in process. U.S. Facts ¶ 84; PPG Opp. at 15. PPG instead speculates that a different federal agency, the Defense Supplies Corporation, provided the subsidy. PPG Opp. at 15. The Defense Supplies Corporation did subsidize the use of higher-grade Russian ore by four other chromium chemical producers, but PPG declined that subsidy. U.S. Facts ¶¶ 88, 89. PPG leaps to the conclusion that the Defense Supplies Corporation must have therefore provided an alternative subsidy to Natural Products for a change in its manufacturing process, but PPG has no actual evidence to support that conclusion.[2]

---

[2]    PPG also speculates about the role of the War Production Board in securing a Defense Supplies Corporation subsidy. But the evidence shows only that the War Production Board considered the subsidy proposal, not that it ever implemented the proposal. PPG Opp. at 19, 21, 38.
     As a last-ditch effort, PPG insinuates that the United States destroyed documents that would have shown a subsidy for a process change. *E.g.*, PPG Opp. at 16, 19–20, 35, 37. But PPG gives no reason to believe that any such documents ever existed. Rather, the fact that the parties found numerous historical documents about the consideration of and ultimate rejection of a subsidy for a process change, as well as documents confirming the separate subsidy program for high-grade ore use by the four other chromium chemicals producers, U.S. Facts ¶¶ 80–90, suggests that there simply never was a subsidy for a process change. Further, PPG

## II. PPG cannot meet its burden of demonstrating that it has incurred necessary response costs consistent with the National Contingency Plan.

PPG's supplemental statement of facts does not alter the conclusion that PPG is barred from recovering cleanup costs under CERCLA because it did not substantially comply with the National Contingency Plan's public-participation provisions. *See* U.S. Br. (ECF No. 152-2) at 25–29; U.S. Opp. (ECF No. 167) at 23–28. Rather, PPG's supplemental statement confirms that the public never had a chance to participate in selecting response actions at the Sites. *See* PPG Suppl. Facts (ECF No. 169-2). PPG's supplemental statements fall into four categories:

In the first category are statements that are disputed by the United States because they are unsupported by the documents PPG cites or contradicted by the record. *See* PPG Suppl. Facts ¶¶ 8, 12–16; U.S. Suppl. Resp. ¶¶ 8, 12–16; *see generally* U.S. Suppl. Resp. They can play no role in the summary-judgment analysis. *See* Fed. R. Civ. P. 56 (summary judgment appropriate if "there is no genuine dispute as to any material fact").

A second set of statements are off topic. Instead of addressing response actions at the Sites, some statements deal with public feedback on the 2009 Judgment with New Jersey, the state's cleanup standards, health studies, and the timeline (but not substance) of the cleanup. *See* PPG Suppl. Facts ¶¶ 6, 9, 13, 15;

---

is not entitled to an adverse inference against the United States based on its routine document preservation practices. U.S. Opp. at 12 n.2.

U.S. Suppl. Resp. ¶¶ 6, 9, 13, 15; *see also* PPG Opp. at 43 & n.5, 44 & n.8 (referencing discussions of the 2009 Judgment, health studies, and cleanup timeline).  Other statements discuss sites *not* in dispute here.  *See* PPG Suppl. Facts ¶¶ 2–3, 5, 7; U.S. Suppl. Resp. ¶¶ 2–3, 5, 7.  And a handful of the statements mention community outreach, but not the kind envisioned by the National Contingency Plan.  *See* PPG Suppl. Facts ¶¶ 8, 9, 16; U.S. Suppl. Resp. ¶¶ 8, 9, 16.  None of these statements, then, can possibly show that PPG substantially complied with the Plan's public-participation provisions.

A third set of PPG's statements speak of promises to involve the public, not of its actual involvement.  Thus in place of evidence that it solicited the public's views, PPG offers only its acknowledgement of outreach recommendations that ignore public input.  *See* PPG Suppl. Facts ¶ 8; U.S. Suppl. Resp. ¶ 8.  In place of evidence that the community was invited to comment on remedial investigations, PPG offers only a draft remedial-investigation plan that discusses community relations.  *See* PPG Suppl. Facts ¶ 4; U.S. Suppl. Resp. ¶ 4.  And in place of evidence that the Site Administrator (or anybody else) asked the public for their views on various cleanup proposals, PPG offers only the Site Administrator's promise to solicit input.  *See* PPG Suppl. Facts ¶ 12; U.S. Suppl. Resp. ¶ 12.  These empty words, in short, do not evidence public participation.

7

The final set of PPG's statements show that when PPG did reach out to the public about Site cleanup, it invited no feedback. There was no meaningful opportunity for public comment when PPG's outreach largely consisted of summarizing "significant developments that *have* occurred," U.S. Suppl. Resp. ¶ 5 (quoting Chrome Update 33, Dec. 2007) (emphasis added), or "roll[ing] out a communications plan to *inform* the community of the *decision* to excavate," *id*. at ¶ 11 (quoting PPG Suppl. Ex. 21, ECF No. 170-18, at PPGNPR0274264) (emphases added). Far from disproving the United States' argument, those statements show that PPG presented cleanup decisions as done deals and, in so doing, cut off any meaningful public feedback. That falls well short of satisfying the National Contingency Plan's public-participation provisions.[3]

## III. **PPG gives no reason why the United States expert opinions should not be considered.**

PPG claims that the United States' reliance on expert opinions is improper, but it does not explain why the United States' expert opinions are inadmissible. PPG Opp. at 1-3. PPG instead suggests that because it did not have an opportunity

---

[3] PPG erroneously claims that because the United States did not seek summary judgment on PPG's compliance with provisions of the National Contingency Plan other than those relating to public participation, PPG is entitled to summary judgment on those issues. PPG Opp. at 39. But the United States expressly stated that it was not conceding those issues. U.S. Br. at 26 n.11. Even without such a statement, the United States' decision not to raise those issues on summary judgment does not entitle PPG to summary judgment, as issues not decided on summary judgment are reserved for trial.

to file *Daubert* motions before summary judgment, the United States should not be permitted to rely on expert opinion. But even without a *Daubert* briefing, PPG still had the opportunity to raise in summary judgment briefing an objection that the expert opinions "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). PPG could also have objected to excessive reliance by the United States on its experts and moved to strike the expert opinions. *See* U.S. Suppl. Resp. ¶ 1. PPG did neither. In any event, the key historical documents filed as exhibits to the United States' motion speak for themselves. Further, the principal basis for the United States' entitlement to summary judgment is PPG's lack of evidence of operator or arranger liability, and the Court need not rely on expert opinion to recognize the absence of evidence produced by PPG.

June 7, 2018               Respectfully submitted,

JEFFREY H. WOOD
Acting Assistant Attorney General

*/s/ Tsuki Hoshijima*
JOHN E. SULLIVAN
SUE CHEN
TSUKI HOSHIJIMA
Environmental Defense Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044
Tel: 202-514-3468
tsuki.hoshijima@usdoj.gov

*Counsel for Defendants-Counterclaimants*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 7, 2018, I filed the foregoing using the Court's CM/ECF system, which will electronically serve all counsel of record registered to use the CM/ECF system.

*/s/ Tsuki Hoshijima*