# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| PPP INDUSTRIES, INC., | |
| *Plaintiffs*, | Civil Action No. 12-3526 (JMV) (MAH) |
| v. | **OPINION** |
| UNITED STATES OF AMERICA, UNITED STATES DEPARTMENT OF COMMERCE, WILBUR ROSS, SECRETARY OF COMMERCE, in his official capacity, UNITED STATES DEPARTMENT OF DEFENSE, | |
| *Defendants*. | |

**John Michael Vazquez, U.S.D.J.**

This case concerns responsibility for environmental cleanup costs. PPG Industries, Inc. ("Plaintiff" or "PPG") alleges that Defendants must contribute to remediation costs associated with a chemical plant facility. Specifically, Plaintiff seeks (1) cost recovery and contribution under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*; (2) assistance in remediation under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*; and (3) relief under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.* D.E. 16. Defendants are comprised of United States of America; United States Department of Defense; United States Department of Commerce; and Wilbur Ross, Secretary of Commerce, in his official capacity[1] (collectively "Defendants" or "Government").

---

[1] Plaintiff originally brought this action against John Bryson, Secretary of Commerce, in his official capacity; however, Wilbur Ross has since replaced Bryson. "An action does not abate

Much of the relevant activity occurred during World War I ("WWI") and World War II ("WWII"). Both parties have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. D.E. 152, 153. The Court reviewed all submissions,[2] and considered the motions without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons that follow, Plaintiff's motion for summary judgment is denied and Defendants' motion for summary judgment is granted.

## I. REGULATORY BACKGROUND

In May of 1982, the City of Jersey City notified PPG that 902 Garfield Avenue (the "Site") in Jersey City, New Jersey, and a number of other Hudson County chromate sites,[3] "may be a danger to public health, safety and welfare" due to the Site's pollution. D.E. 153-3 ¶¶ 4, 135 ("Pl. SOMF"). PPG notified the New Jersey Department of Environmental Protection ("NJDEP") and the United States Environmental Protection Agency ("EPA"). *Id.* ¶ 136. Plaintiff then conducted sampling to quantify and assess the contamination. *Id.* ¶ 139. Upon confirmation of

---

when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party." Fed. R. Civ. P. 25(d). Therefore, Ross is substituted for Bryson.

[2] Plaintiff's Amended Complaint is referred to as "Am. Compl.," D.E. 16; Defendants' Answer and Counterclaim is referred to as "Def. Ans.," D.E. 19; Plaintiff's Answer to the Counterclaim is referred to as "Pl. Ans.," D.E. 20; Defendants' brief in support of its motion for summary judgment is referred to as "Def. Br.," D.E. 152-2; Plaintiff's brief in opposition is referred to as "Pl. Opp'n," D.E. 169; Defendants' reply is referred to as "Def. Reply," D.E. 174; Plaintiff's brief in support of its motion for summary judgment is referred to as "Pl. Br.," D.E. 153-1; Defendants' brief in opposition is referred to as "Def. Opp'n," D.E. 167; Plaintiff's reply is referred to as "Pl. Reply," D.E. 175.

[3] These include the following Jersey City, New Jersey properties: 800 Garfield Avenue ("Ten West Property"), 816 Garfield Avenue ("Fishbein Property"), 86/90-100 Forrest Street ("Forrest Street Avenue Properties"), 78-104 Halladay Street ("Halstead Properties"), and a property near Caven Point Road ("Caven Point Property") (collectively, the "Properties").

contamination, Plaintiff engaged in numerous investigatory, removal, and response actions at the Site and neighboring properties. *Id.* ¶¶ 135, 140.

In July 1990, Plaintiff entered an Administrative Consent Order ("1990 Order") with NJDEP to settle alleged violations of New Jersey's Spill Compensation and Control Act, N.J.S.A. 58:10-23.11a, and Water Pollution Control Act, N.J.S.A. 58:10A-1. D.E. 152-1 ¶ 125 ("Def. SOMF"). In the 1990 Order, Plaintiff agreed to pay civil penalties and reimburse New Jersey for all costs incurred in connection with the state's investigation and remediation of chromite ore processing discharges at the Site. *Id.* ¶ 126. The order also required Plaintiff to perform a "comprehensive suite of response activities" at the Site and other locations, including "implementation of interim remedial measures," "performance of a remedial investigation and feasibility study," "identification and implementation of remedial action to remedy the problems associated with the hazardous substances discharged at the [Site]," "submission and implementation of field sampling and quality assurance plans," and "quarterly submissions of progress reports." *Id.* ¶ 127.

In June 2009, Plaintiff, New Jersey, and Jersey City settled a state court case, *NJDEP v. Honeywell Int'l*, No. HUD-C-77-05 (N.J. Sup. Ct. 2009), by signing and filing a Partial Consent Judgment ("2009 Judgment"). *Id.* ¶ 128. The 2009 Judgment resolved PPG's liability to New Jersey and Jersey City for claims under CERCLA, RCRA, and other environmental laws. *Id.* ¶¶ 128, 130. However, it also required that Plaintiff continue to conduct remediation under the terms of the 1990 Order. *Id.* ¶ 131. In response, Plaintiff "has engaged in various cleanup activities, including removal of contaminated soil from the Site, treatment of impacted groundwater, and

studies to further delineate contamination in soil and groundwater and determine site restoration measures." *Id.* ¶ 132.[4]

An additional consent decree was then agreed upon by Plaintiff; Interfaith Community Organization, Inc.; Graco Community Organization; and National Resources Defense Council ("NRDC") in April 2011 ("2011 Decree"). *Id.* ¶ 142; D.E. 159-29. The 2011 Decree, among other requirements, further refined Plaintiff's obligations in excavating and removing all chromium-chemical contaminated waste, soil, and groundwater in the area. *Id.* Plaintiff asserts that it continues to remediate the Site and neighboring properties and has incurred $361 million in remediation costs through December 2105. Pl. SOMF ¶¶ 143, 147.

## II. PROCEDURAL HISTORY

Plaintiff filed its Complaint on June 12, 2012, D.E. 1, and its Amended Complaint on October 31, 2012, D.E. 16. Defendants answered the Amended Complaint on December 19, 2012, and counterclaimed as to allocation of response costs among liable parties. D.E. 19. Plaintiff answered the counterclaims on January 7, 2013, asserting nine separate defenses. D.E. 20. The parties then engaged in over four years of discovery. Defendants filed their motion for summary judgment on February 28, 2018, D.E. 152, which Plaintiff opposed, D.E. 169, and Defendants replied, D.E. 174. Plaintiff also filed its motion for summary judgment on February 28, 2018, D.E. 153, which Defendants opposed, D.E. 167, and Plaintiff replied, D.E. 175.

## III. STANDARD OF REVIEW

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[4] The parties dispute the amount of public comment and participation that occurred in conjunction with these subsequent remedial efforts. *E.g.,* Def. SOMF ¶¶ 133-145; Pl. RESP ¶¶ 133-145. Because the Court finds other issues dispositive, it does not reach the public comment arguments.

Fed. R. Civ. P. 56(a). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and *all justifiable inferences* are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (emphasis added) (quoting *Anderson*, 477 U.S. at 255)). In other words, a court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

## IV. FACTUAL BACKGROUND[5]

Many of the actual facts are not disputed. Instead, the parties primarily battle over the justifiable or reasonable inferences that are to be drawn from those facts. As a result, when reviewing the factual background, the Court makes express findings as to whether an alleged inference is justifiable or not. The Court also indicates where factual matters are in dispute.

### A. The Parties

Plaintiff PPG is a Pennsylvania corporation that was the owner and operator of a chromite ore processing plant at the Site, from July 1954 to June 1962, before selling its buildings, property, and equipment in 1964. Pl. SOMF ¶¶ 1-2. Plaintiff purchased the Site from Natural Products Refining Company ("NPR") in 1954. *Id.* ¶¶ 14-15. NPR had owned and operated the Site since 1910. *Id.* ¶ 3.

NPR's operations at the Site involved converting chrome ore to chromium chemicals, such as sodium bichromate, which is used in dying cloth and tanning leather. Pl. SOMF ¶ 8; Def. RESP ¶ 10; Def. SOMF ¶ 4. The production process created a residue, a "mud" or "sludge," which NPR

---

[5] The factual background is derived from the following information: Plaintiff's Amended Complaint, D.E. 16; Defendants' Answer to Plaintiff's Amended Complaint, D.E. 19; Defendants' statement of undisputed material facts ("Def. SOMF"), D.E. 152-1; Plaintiff's response to this statement ("Pl. RESP"), D.E. 169-1; Plaintiff's statement of undisputed facts ("Pl. SOMF"), D.E. 153-3; Defendants' response to this statement ("Def. RESP"), D.E. 168; Plaintiff's supplemental statement of undisputed material facts ("Pl. Supp. SOMF"), D.E. 169-2; and Defendants' response to this supplemental statement ("Def Supp. RESP"), D.E. 174-1.

partially stockpiled and partially recycled. Pl. SOMF ¶ 9. The stockpiled material, or "waste," contained hazardous substances. *Id.* NPR stockpiled some of this hazardous waste on the Site. *Id.* Plaintiff alleges that Defendant United States (through specific agencies, the successors of which are listed as the other Defendants in this action) exercised substantial control of the Site during WWI and WWII and directed management of this waste. *Id.* ¶ 6; Am. Compl. ¶ 3. Defendants dispute this assertion. Def. RESP ¶ 6. Plaintiffs allege that Defendants' involvement in the Site's production and storage of hazardous waste makes Defendants liable to Plaintiffs for the cleanup costs associated with this waste. Am. Compl. ¶ 3.

## B. The Government's Involvement in the Chromium Chemical Industry

During WWI and WWII (collectively the "Wars"), the chromium chemicals industry in the United States consisted of five producers, including NPR, and six plants, including the Site. Pl. SOMF ¶¶ 19-20. The companies produced chrome chemicals for both the Government and civilian consumption during the Wars. *Id.* ¶ 21. During the Wars, the Government designated chromium chemicals as critical "war material" – products manufactured for direct military or other war use by the Government – and implemented a number of controls. *Id.* ¶ 22, n.2.

### 1. Price Controls

During WWI, the Government tasked the War Industries Board ("WIB") with stimulating and expanding the production of war material. *Id.* ¶ 26, Def. RESP ¶ 26. The Government fixed prices for raw materials in the chromium industry in order to prevent competitive bidding and afford the WIB greater control over the industry. *Id.* ¶¶ 23, 27. The Government maintains that this was a "voluntary" pricing scheme that sought cooperation from impacted businesses. Def. RESP ¶ 23. However, The National Defense Act of 1916 authorized Government seizure of manufacturing plants (including chromium chemical plants) that did not comply with the

Government's directives or "voluntary" pricing. Pl. SOMF ¶ 24.[6] Viewing this evidence in a light most favorable to PPG, as to the Government's motion, the Court finds that the "voluntary" pricing was not in fact voluntary due to the potential penalty of seizure.

During WWII, chromium ore and chromium chemicals remained critical and essential war materials. *Id.* ¶ 38. The Government created a number of new agencies to regulate war materials, such as the Office of Production Management ("OPM") to assess the Government's war material needs; the Metals Reserve Company ("MRC") to control the purchase and stockpile of war materials; the Office of Price Administration ("OPA") to control the price of all material deemed necessary for the war effort; the Defense Supplies Corporation ("DSC") to provide subsidies for domestic materials production; and later the War Production Board ("WPB") to control the pricing, production, allocation, and supply of all war material, including both raw ingredients and finished products. *Id.* ¶¶ 33, 35, 36.

During WWII, in November 1942, the OPA passed Maximum Price Regulation 258 ("MPR 258"), giving MRC the authority to set a ceiling price on chrome ore. *Id.* ¶ 39. As a result, MRC immediately raised the price of chrome ore by $2.00 per ton, the OPA ceiling. *Id.* ¶ 40. The Government became the only source of chrome ore, "having purchased all available ore and prohibiting private industry imports, giving the producers no choice but to buy from the Government." *Id.* ¶ 42. MPR 258 also prohibited chrome producers, such as NPR, from raising their prices of chromium chemicals to account for the increased price of raw materials. *Id.* ¶ 43. MRC later reduced the price of chrome ore by $2.00 per ton in mid-1943, but an amendment to

---

[6] Plaintiff also points to the following facts. Bernard Baruch, a chairman of the WIB, later stated in a lecture at the Army War College that the fixed prices "were not fair." *Id.* ¶¶ 25, 29, 30. Baruch added that the Government did not have regulatory authority to fix unfair prices, and had any contractor challenged the pricing scheme and created a written record of being forced to comply under duress, "it would have been . . . very serious." *Id.* ¶ 31.

MPR 258 allowed MRC to add freight charges for shipment of chromium ore from the Government stockpile. *Id.* ¶ 45. Given the evidence, for the purposes of this motion, the Court therefore finds that the Government controlled the supply of chromium ore, the price of raw materials (ore), and the price of finished products (chromium chemicals) at NPR's facility during the relevant time periods.

### 2. Labor Controls

Towards the end of WWI, in April 1918, President Wilson established the National War Labor Board ("WLB") to prevent war-time labor disputes from disrupting military production. *Id.* ¶ 68. During WWII, around 1945, the WLB commandeered a Diamond Alkali plant in response to a labor strike. *Id.* ¶ 69; D.E. 157-4 at 5. Seizures of plants, resulting from labor unrest or management noncompliance, developed into a major U.S. Army domestic function throughout WWII. *Id.* ¶ 70.

In 1944, the Government sent field inspectors to NPR's facility and noted that "the labor situation has improved very little." *Id.* ¶ 75; D.E. 154-16 at 1, 2-3. In speaking with NPR management, the Government recognized that the "plant has been operating only six days a week because [NPR] can not [sic] affor[d] to pay double time labor for Sunday operation and still operate within the OPA price ceilings." *Id.* ¶¶ 124, 126; D.E. 154-16 at 1, 2-3. The Government also noted that NPR had "not been able to obtain additional labor." *Id.* Consequently, NPR and its employee's union applied for "approval of wage or salary rate adjustment" to the WLB in December 1943. D.E. 157-8 at 5. The WLB denied this application. *Id.*

In February 1944, NPR's employee's union filed a strike notice. *Id.* ¶ 73; D.E. 157-8 at 2. The WLB held a preliminary hearing on the matter, with a WLB representative from the Chemical Bureau participating. Pl. SOMF ¶ 73; D.E. 157-7 at 4. Although unclear why, NPR's union later

withdrew its complaint in March 1944. D.E. 157-8 at 1, 2. The record does not indicate that NPR's employees definitively received the wage increase that they had sought. If a wage increase occurred, it apparently would have needed Government support. Pl. SOMF ¶ 76; Def. RESP ¶ 76 (explaining that the WPB figured that the support of the support of the Army, Navy and itself "should assure [the Wage Labor Board's] approval" of a wage resolution between a company and a union). There is no evidence that the Government ever seized NPR's plant as a result of this labor dispute or any other time.

### 3. Production Controls

During the beginning of WWI, in approximately 1915, Germany halted its supply of a critical raw material in the production of potassium bichromate which led to an increased demand for sodium bichromate. *Id.* ¶ 10. In March 1933, NPR patented new ways to produce sodium bichromate. *Id.* ¶ 11. The new patent described two alternative modifications to chromium processing in order to increase production: (1) adding a second "leach process" to rework chromium waste for a 90-95% chrome chemical recovery from the ore (thereby decreasing the amount of waste produced by the facility); and (2) simply adding more "lime and soda ash" to the process for a 60-70% chrome chemical recovery from the ore (thereby increasing the amount of waste produced by the facility). *Id.* ¶¶ 12-13. Plaintiff alleges that Defendants "demanded" that NPR utilize the second method and that NPR did so. *Id.* ¶ 13. Defendants argue that they only "proposed" that NPR utilize the second method and that there is no evidence that NPR did in fact switch to this different process. Def. RESP ¶ 13. Plaintiff presents no evidence to support its claim that the Government demanded the increase, thus the Court finds that the Government requested it for purposes of the current motion. The evidence concerning production increases is discussed below.

## 4. Subsidies

During WWII, at a meeting on February 7, 1944, the Government and a number of military agencies addressed an increasing chrome chemicals shortage as war production demands amplified. Pl. SOMF ¶ 85, 87-88; Def. RESP ¶ 87. The WPB Chemicals Bureau recognized that "(1) production costs had increased 30% since 1941; (2) labor shortages were frequent; and (3) no additional source of production existed." *Id.* One of the five major producers of chrome chemicals even warned of a complete shutdown if it did not receive any assistance or relief. PL SOMF ¶ 86. Therefore, given that "85% of the [chromium chemical] product was for military use," the Government contemplated that "[p]ossibly the Army and Navy could subsidize the job." *Id.* ¶¶ 88, 89. Further, after visiting the NPR facility in March 1944, the Government noted that NPR was operating at a loss and eliminating the reworking of sludge seemed to be the only viable method of increasing production at the plant. Pl. SOMF ¶ 96.

The Government proposed two subsidies: (1) the Government would supply facilities with higher grade ore in enough qualities to increase production, and/or (2) the Government would purchase waste sludge from the facilities to eliminate the rework of chrome ore. *Id.* ¶ 94, D.E. 154-9 at 8. While other producers participated in the first subsidy, that is, the Government supply of higher-grade ore, NPR did not. D.E. 152-23, Exs. 95, 96. The parties dispute whether the parties entered into the second proposal, that is, whether the Government purchased waste sludge from NPR.

Typically, facilities would rework the sludge that its manufacturing process created. Pl. SOMF ¶¶ 9. By running the sludge back through the manufacturing process again (or "reworking" it), the facilities were able to recover more chromium chemicals (finished product) from the same amount of chromium ore (raw material). *Id.* ¶ 12. However, by reworking the sludge, facilities

exerted time and energy on a manufacturing process that was less efficient than simply discarding the sludge and starting a new process with fresh raw material. *Id.* ¶¶ 12-13. Therefore, the second proposal would allow facilities to increase production but also create more waste, and the Government would agree to purchase some of the additional waste. *Id.* ¶ 91. If implemented, MRC would "take title to the low[-]grade sludge, ostensibly of some value either for later chemical retreatment or for metallurgical use, but probably of use mainly to cover up the subsidy." Def. RESP ¶ 87.

The Government maintains that the sludge-purchase subsidy never occurred. Def. RESP ¶¶ 88, 89. The Government cites an April 12, 1944 letter from Jesse Jones, the Secretary of Commerce, to Donald Nelson, the Chairman of the War Production Board, whereby Jones stated that "the plan for the purchase of a sludge . . . from one producer of chrome chemicals falls outside the present scope of the [MRC] program . . . and the Chemicals Division [of the WPB] was then informed that [MRC] is without authority to buy products of this type." *Id.*; D.E. 168-1 at 2. MRC therefore formally rejected this subsidy plan as falling outside its "sphere of activities." *Id.*

Plaintiff contends that a sludge-purchase subsidy did in fact occur. Pl. Br. at 22. Plaintiff explains that by August 1944, a rail embargo further complicated the shipping of ore, causing all new shipments of Transvaal ore[7] to cease. *Id.* In late August 1944, WPB drafted a schedule of anticipated shipments of both Transvaal ore and higher-grade ore to chrome producers. *Id.* In this schedule, NPR was the only producer scheduled to receive solely Transvaal ore from July to December of 1944, while all other producers were scheduled to receive stocks of higher-grade ores. *Id.* Plaintiff claims that because NPR was still able to increase production by at least 500,000 pounds per month, and "was the only [producer] to exceed its quota" in December 1944, NPR

---

[7] Transvaal ore is a lower-grade ore. Pl. SOMF ¶ 98.

must have implemented the more wasteful technique of chromium processing, *i.e.*, NPR must have stopped the reworking of the sludge. *Id.* at 22-23. Plaintiff continues that for NPR to have done so, the Government must have subsidized the process by purchasing the excess sludge. *Id.* at 22-23. Plaintiff speculates that a different governmental agency, the DSC, must have purchased the sludge since MRC refused and the DSC was offering other subsidies. Pl. Opp'n at 15.

However, the Government has produced documents showing that NPR was explicitly *not* involved in DSC subsidies. Def. Reply at 5; D.E. 152-23, Ex. 95. On June 2, 1944, the DSC wrote NPR to inform it of a subsidy whereby the DSC would reimburse chromium chemical producers for unusual costs resulting from the use of a high-grade ore from June 1, 1944 through October 31, 1944. *Id.* NPR responded on June 8, 1944 that it had "no high[-]grade ore on hand . . . nor do[es] [it] anticipate the purchase of any," effectively opting out of the subsidy. Def. Reply at 5; D.E. 152-23, Ex. 96. The DSC then conducted an internal audit of its high-grade ore subsidy on June 20, 1945 and noted subsidizing four of the five chrome chemical producers (all but NPR) from June 1, 1944 to October 31, 1944. Def. Reply at 5; D.E. 152-23, Ex. 97. Further, on December 22, 1944, a government memorandum listed four types of active subsidies,[8] and although it stated that the chromium chemical industry was "[a]lmost entirely subsidized," it did not list a sludge repurchase program. Def. RESP ¶ 101; D.E. 158-20 at 1-2.

Additionally, Defendants point out that NPR's quarterly production does not support the conclusion that the Government entered into a sludge purchasing subsidy with NPR following the

---

[8] The four subsidies were (1) "Direct out-of-pocket loss by the government purchasing agency in transferring the material from government ownership to industry for use;" (2) "Waiver of import duty or tariff;" (3) "Government agency construction of facilities for production or processing, but not including loans of money to private parties for such construction;" and (4) "Use of government equipment on rental basis and government services not included in cost of material, when known." D.E. 158-20 at 1.

February of 1944 meeting. Def. Reply at 4. Defendants note that "the increase in production in the fourth quarter [October, November, and December] of 1944 was marginal and [NPR]'s production in the third quarter [July, August, and September] of 1944 actually fell compared to the first and second quarters [January through June]." *Id.* While an August 1944 embargo on NPR's ore may have accounted for the third quarter decrease in production, Defendants argue that that a fourth quarter sludge purchase subsidy would have had more of an impact than a "marginal" increase in production, and additionally, attributing this fourth quarter rebound to the adoption of a sludge purchase subsidy specifically during this time period (October, November, and December of 1944) – eight months after the February meeting where the proposal was discussed, and six months after the government's letter in April rejecting the sludge purchase subsidy – amounts to nothing more than "sheer speculation." *Id.*

Based on the evidence, for purposes of the motions, the Court finds that it is not a justifiable or reasonable inference to conclude that the sludge-purchase subsidy occurred. While there is evidence that the Government *proposed* potential subsidies (and some were implemented), there is no evidence that the Government actually implemented the proposed subsidy as to purchasing sludge. MRC refused to provide the subsidy because it was outside its authority, and there is no evidence that DSC (or any other governmental entity) offered such a subsidy.

Plaintiff further alleges that the "WPB did control and direct disposal of NPR's waste mud, specifying that it would initially be stored outside, onsite at the producer's plant." Pl. Opp'n at 21. However, in support, Plaintiff cites only to a discussion between WPB members when they were evaluating the feasibility of the proposed sludge-purchasing subsidy and one member asked, "[h]ow would you stockpile something like that?", to which another responded, "I would expect it would be outdoor storage." Pl. SOMF ¶ 92. As noted, the Court finds that there is insufficient

information to conclude (for purposes of the current motion) that the sludge-purchase subsidy proposal ever materialized. Similarly, the Court does not find it to be a reasonable or justifiable inference that WPB controlled and directed disposal of NPR's waste mud from this single inquiry and response – neither of which amounted to the Government directing NPR as to how to dispose of the waste mud.

### 5. Plaintiff's Additional Factual Allegations

Plaintiff makes a number of additional factual allegations, or related inferences, as to the Government's control of NPR's facility that the Court will address before conducting its legal analysis. Plaintiff alleges that NPR "lost complete control of its plant to the Government" and that the Government "took control of all aspects of NPR's operations including production, process, labor and pricing." Pl. Opp'n at 7. The Court disagrees. During the Wars, the Government controlled the price of raw materials (ore) and finished products (chromium chemicals), oversaw labor disputes in the industry at large, and conferred with producers about production alternatives, but NPR controlled the day-to-day operations at its Site. The facts do not indicate than any Government employees were stationed at, or that the Government ever seized, NPR's facility.

Plaintiff alleges that the Government conducted "many visits" to NPR's facility. Pl. Opp'n at 8. However, the record only indicates one Government visit to NPR's facility (sometime in the two weeks leading up to March 1, 1944). Pl. SOMF ¶ 96; D.E. 153-11; D.E. 153-12. Plaintiff alleges that because "video surveillance did not yet exist," "there were no other means of monitoring conditions at these facilities other than regular visits to and inspections of the chrome plants." Pl. Opp'n at 8. Yet, as evidenced by the relevant exhibits, the parties frequently corresponded via mail, specifically sending letters and reports back and forth regarding updates at the Site. *E.g.,* D.E. 152-23, Ex. 96. Additionally, Plaintiff argues that because the different

chromium chemical plants were "very close in proximity to each other," "visiting several plants during one trip was easily accomplished by the Government[.]" Pl. Opp'n at 8. However, Plaintiff fails to provide sufficient evidence to support this theory. For example, Plaintiff does not produce information demonstrating that the Government visited other nearby facilities on certain dates, much less that it was the Government's practice to visit all facilities at the same time. Therefore, given the evidence, the Court does not find it to be a justifiable or reasonable inference that the Government conducted "many visits" to NPR's facility.

At multiple times in its papers, Plaintiff defends its lack of evidentiary support to the "Government's destruction" of evidence. *E.g., Id.* However, Plaintiff has not brought any spoliation claims. As best as the Court can discern, the Government destroyed much relevant information relatively soon after WWII based on established protocol; the Court has been presented with no evidence that the Government destroyed any information due to concerns over potential environmental liability. Further, nothing prevented NPR (or Plaintiff after it purchased NPR) from preserving its documentary evidence. The nature of such lost evidence – and whether it would have benefited PPG or the Government – requires pure speculation.

Plaintiff states that "the Government supplied additional labor from POW camps and foreign worker pools" and that "some of these laborers were sent to plants in and around Chicago, Cleveland, and New York." *Id.* at 14-15. From this, Plaintiff alleges, "[t]hus, there is no reason to believe that available workers were not also provided to neighboring New Jersey plants. Nor any reason to believe that NPR would have refused them." The Court does not credit such speculation absent some reliable basis to infer that NPR benefitted from such labor. Plaintiff also alleges that since the Government directed one of its agencies to "make all effort" to increase NPR's production, the Government must have supplied labor to the facility. *Id.* at 15. Again, the

record does not include sufficient evidence to support this contention – or at least to draw a justifiable inference of such fact. Given the evidence in the record, for the purposes of this motion, the Court does not find it to be a reasonable or justifiable inference that the Government supplied labor to NPR's facility.

## V.  ANALYSIS

The issue is whether PPG or the Government is entitled to summary judgment as to the Government's liability for cleanup costs under CERCLA, 42 U.S.C. § 9601 *et seq.*, and RCRA, 42 U.S.C. § 6901 *et seq.* Am. Compl. ¶ 1. The Court analyzes each in turn.

### A.  CERCLA

Plaintiff argues that the Government is liable under CERCLA because the "government qualifies as both an operator and as an arranger under CERCLA, requiring it to contribute to the clean up of chromium wastes and other hazardous substances that were discharged" at the Site.[9] Pl. Br. at 38; Pl. Opp'n at 29-39. Defendants argue that Plaintiff failed to "produce enough evidence to support" that the Government is liable under CERCLA "on either operator or arranger liability." Def. Opp'n at 13; Def. Br. at 15-16.

#### 1.  CERCLA Overview

Congress enacted CERCLA, codified as 42 U.S.C. § 9601 *et seq.*, "to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009) (internal quotations omitted). "CERCLA provides two mechanisms that

---

[9] CERCLA contains a provision waiving sovereign immunity for the United States. *See* 42 U.S.C. § 9620(a)(1) ("Each department, agency, and instrumentality of the United States (including the executive, legislative, and judicial branches of government) shall be subject to, and comply with, this chapter in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity[.]").

allow potentially responsible parties ("PRPs") to recover costs they have expended to decontaminate a polluted site: § 107(a) cost recovery claims and § 113(f) contribution claims." *Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.*, 602 F.3d 204, 216 (3d Cir. 2010). Section 107(a), in part, allows private parties to hold PRPs responsible for "any other necessary costs of response incurred by any other person" consistent with CERCLA. 42 U.S.C. § 9607(a)(4)(B); *Agere Sys., Inc.*, 602 F.3d at 225. A Section 113(f) contribution claim allows a PRP to recover cleanup costs from other PRPs following a civil action under CERCLA or an approved settlement. 42 U.S.C. § 9613;[10] *Agere Sys., Inc.*, 602 F.3d at 217-18 (describing CERCLA Section 107 and Section 113). Here, Plaintiff is seeking recovery pursuant to both Sections 107(a) and 113(f) of CERCLA. Am. Compl. ¶¶ 1, 62-74 (Count I seeking cost recovery under Section 107(a), and Count II seeking contribution under Section 113(f)).

Under CERCLA, PRPs are:

> (1) the owner and operator of a vessel or a facility,
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a

---

[10] Section 113(f)(1) provides for a right to contribution following a civil action under CERCLA, stating that "[a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title." 42 U.S.C. § 9613. Section 113(f)(3)(B) provides for a right to contribution after liability to a State or the United States has been determined in "an administrative or judicially approved settlement." 42 U.S.C. § 9613 (Section 113(f)(3)(B) referring to 113(f)(2)).

> threatened release which causes the incurrence of response costs, of
> a hazardous substance[.]

42 U.S.C. § 9607(a)(1)-(4); *Litgo New Jersey Inc. v. Comm'r New Jersey Dep't of Envtl. Prot.*, 725 F.3d 369, 379 (3d Cir. 2013). The term "person" under the statute includes the United States Government. 42 U.S.C. § 9601(21). Plaintiff alleges that the Government meets the definition of both "operator" and "arranger." Pl. Br. at 43-54.

"CERCLA liability may be inferred from the totality of the circumstances; it need not be proven by direct evidence. Particularly in cases where the issues date back to the 1940s and direct evidence is rare, the Court must rely upon circumstantial evidence." *United States v. Cornell-Dubilier Elecs., Inc.*, No. 12-5407 JLL, 2014 WL 4978635, at *8 (D.N.J. Oct. 3, 2014) (citing *Tosco Corp. v. Koch Indus., Inc.*, 216 F.3d 886, 892 (10th Cir. 2000)) (internal quotations omitted). "When determining CERCLA liability, 'there is nothing objectionable in basing findings solely on circumstantial evidence, especially where the passage of time has made direct evidence difficult or impossible to obtain.'" *Niagara Mohawk Power Corp. v. Chevron USA, Inc.*, 596 F.3d 112, 131 (2d Cir. 2010) (quoting *Franklin County Convention Facilities Auth. v. Am. Premier Underwriters*, Inc., 240 F.3d 534, 547 (6th Cir. 2001)).

### 2. Operator Liability

The parties dispute the correct standard to determine whether a person is an "operator" for CERCLA liability purposes. Pl. Br. at 43; Def. Br. at 16. Under the statute, an operator is a person who "controlled activities at such facility." 42 U.S.C. § 9601(20)(A). Plaintiff relies on the Third Circuit definition in *FMC Corp. v. U.S. Dep't of Commerce*, 29 F.3d 833, 843 (3d Cir. 1994), while the Government points to the Supreme Court definition in *United States v. Bestfoods*, 524 U.S. 51, 65 (1998). *Id.*

In *FMC*, the facility at issue included a manufacturing plant, waste disposal bins, and landfill areas. 29 F.3d at 836. During WWII, the WPB designated high tenacity rayon ("HTR"), a rubber substitute, as one of the most critical products in the entire American war production program, and consequently required the facility to convert from producing regular textile rayon to HTR. *Id.* The WPD had the authority to seize non-compliant industries and took over other plants that failed to meet production requirements, leaving the facility without a choice but to convert production. *Id.* To implement the conversion and expansion at the facility, the government, through the Defense Plant Corporation ("DPC"), leased government-owned equipment and machinery to the facility, including fifty spinning machines, an acid spin bath system, piping, slashing equipment, and waste trucks. *Id.* at 837. The government also contracted with a third-party engineer to design and install the equipment, keeping a DPC representative on-site to direct the engineer. *Id.* The government then built and owned an adjoining plant that, through a pipeline, delivered sulfuric acid to the facility. *Id.*

The government controlled the supply and price of the Facility's raw materials, requiring that such raw materials be purchased from the government directly or through the government's rating system. *Id.* Not only did the government provide workers to the facility, but it managed and supervised the facility's laborers, including at one point, positioning a full-time government representative at the facility "to address problems at the facility concerning manpower, housing, community services, and other related matters." *Id.* A government representative also remained on site with the authority "to promulgate rules governing all operations at the site and to remove workers who were incompetent or guilty of misconduct." *Id.* Minutes of a March 7, 1944 meeting also indicated that it was "agreed on unanimously that a WPB Priority man was needed on the [h]ousing situation" at the facility. *Id.* at 845. Further, a letter from the Chairman of the WPB to

another high-ranking official on March 14, 1944 requested the immediate assignment of representatives to address "preparations for manning the [facility]," so as "to meet the production requirements." *Id.*

The production of HTR generated sulfuric acid, carbon bisulfide, and zinc contaminated waste. *Id.* at 838. The government was aware of this hazardous waste because its's personnel present at the facility witnessed the waste accumulating and knew that it was inherent in the production of HTR. *Id.* at 387-38. The government pressured the plant to maximize production, and was aware additional production would result in additional waste. *Id.*

As a result of this government involvement, the district court held the government liable as an "owner, operator, and arranger" under CERCLA. *Id.* at 836 (citing *FMC Corp. v. United States Dep't of Commerce*, 786 F. Supp. 471 (E.D. Pa. 1992)). On appeal, the Third Circuit affirmed this conclusion as to operator and as to arranger (as the Court was evenly split on the arranger issue). *Id.* at 845-46.

In reviewing whether the government qualified as an operator, the *FMC* court looked to the "actual control" test of *Lansford-Coaldale Joint Water Auth. v. Tonolli Corp.*, 4 F.3d 1209 (3d Cir. 1993), whereby an entity was liable for another company's environmental violations if the entity "exercised 'substantial control' over the other corporation," which, "[a]t a minimum, . . . require[d] 'active involvement in the activities'" of the other company. *Id.* (citing *Lansford-Coaldale*, 4 F.3d at 1222). The Circuit also cited *United States v. New Castle County*, 727 F. Supp. 854 (D. Del. 1989), and the factors of "whether the person or entity controlled the finances of the facility; managed the employees of the facility; managed the daily business operations of the facility; was responsible for the maintenance of environmental control at the facility; and conferred

or received any commercial or economic benefit from the facility, other than the payment or receipt

of taxes." *Id.* at 843 (citing *New Castle County*, 727 F. Supp. at 869).

The court in *FMC* then found the following facts to be critical in its operator analysis:

> The government determined what product the facility would
> manufacture, controlled the supply and price of the facility's raw
> materials, in part by building or causing plants to be built near the
> facility for their production, supplied equipment for use in the
> manufacturing process, acted to ensure that the facility retained an
> adequate labor force, participated in the management and
> supervision of the labor force, had the authority to remove workers
> who were incompetent or guilty of misconduct, controlled the price
> of the facility's product, and controlled who could purchase the
> product.

*Id.* at 843. Accordingly, the Third Circuit found that "the leading indicia of control were present,

as the government determined what product the facility would produce, the level of production,

the price of the product, and to whom the product would be sold," effectively "exert[ing]

considerable day-to-day control over [the Facility]." *Id.* at 843-44. The court in *FMC* concluded

that "when we consider 'the totality of the circumstances presented' we cannot reject the district

court's 'inherently fact-intensive' conclusion that the government was an operator of the facility."

*Id.* at 845.

In *Bestfoods*, the critical issue was "whether a parent corporation that actively participated

in, and exercised control over, the operations of a subsidiary may, without more, be held liable as

an operator of a polluting facility owned or operated by the subsidiary." 524 U.S. at 55. The

Supreme Court recognized that a parent company could be *derivatively* liable under CERCLA for

the acts of its subsidiary by piercing the corporate veil. *Id.* at 62. The *Bestfoods* Court continued

that the parent company could also be *directly* liable under CERCLA if it was in fact an operator

of the facility. *Id.* at 65. However, the Court held that "[t]o sharpen the definition for purposes of

CERCLA's concern with environmental contamination, an operator must manage, direct, or

conduct operations *specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.*" *Id.* at 66-67 (emphasis added).

The Supreme Court took issue with the "actual control" test for operator liability because it looked to whether the parent controlled the *subsidiary*—not the critical question of whether the parent controlled the *facility*. *Id.* at 67-68. The Court in *Bestfoods* added that the fact that representatives of the parent company serve on the board of the subsidiary is not enough to impose liability. *Id.* at 70. Further, the Supreme Court observed that accepted norms of parental oversight – such as monitoring the subsidiary's performance, supervising the subsidiary's financial and capital budget decision, and articulating the subsidiary's general policies and procedures – were not enough to impose operator liability. *Id.* at 71-72. Hence, the *Bestfoods* standard looks beyond general control of a company and to specific control over pollution-related activity at a facility. *Id.* at 66-67.

Plaintiff argues that the *Bestfoods* standard of operator liability is limited to the parent-subsidiary relationship. Pl. Opp'n at 32. The Court disagrees. The Supreme Court did not limit its holding in *Bestfoods* solely to the parent-subsidiary context. Therefore, to the extent that *FMC* conflicts with *Bestfoods*, *Bestfoods* controls. Moreover, Plaintiff has not presented any persuasive reasons as to why the definition should be so limited. In fact, several courts have applied the *Bestfoods* definition of operator outside of the parent-subsidiary context, including the Third Circuit. *See Litgo New Jersey Inc. v. Comm'r New Jersey Dep't of Envtl. Prot.*, 725 F.3d 369, 381-83 (3d Cir. 2013) (applying *Bestfoods* to determine whether an independent company, not the parent company, was liable as an operator for its active remediation efforts at a facility). District courts have also incorporated the *Bestfoods* operator liability standard outside of the parent-

subsidiary context, *Virginia St. Fidelco, L.L.C. v. Orbis Prod. Corp.*, No. 11-2057, 2016 WL 4150747, at *5 (D.N.J. Aug. 3, 2016) (McNulty, J.), and specifically applied it in the wartime government control context, *e.g., Exxon Mobil Corp. v. United States*, 108 F. Supp. 3d 486, 522-23 (S.D. Tex. 2015); *Litgo N.J., Inc. v. Bob Martin*, No. 06-2891, 2010 WL 2400388, at *23 (D.N.J. June 10, 2010) (Thompson, J.), *on reconsideration in part sub nom. Litgo New Jersey, Inc. v. Martin*, No. 06-2891, 2011 WL 65933 (D.N.J. Jan. 7, 2011), *aff'd in part, rev'd in part sub nom. Litgo New Jersey Inc. v. Comm'r New Jersey Dep't of Envtl. Prot.*, 725 F.3d 369 (3d Cir. 2013);[11] *Coeur D'Alene Tribe v. Asarco Inc.*, 280 F. Supp. 3d 1094, 1127 (D. Idaho 2003), *modified in part sub nom. United States v. Asarco Inc.*, 471 F. Supp. 2d 1063 (D. Idaho 2005).

Under *Bestfoods*, the government's general wartime control over an industry is insufficient to establish operator liability. "Bestfoods clearly requires more than general influence over the economy or over a plant's operations, even if the result could increase waste production," as "[c]ourts have repeatedly rejected arguments that similar procurement activities during wartime to fill national defense needs are enough for operator liability." *Exxon*, 108 F. Supp. 3d at 522-23. "*Bestfoods* requires a direct nexus between the government's activities and the decisions in the

---

[11] In *Litgo*, the district judge applied the *Bestfoods* standard to the United States in determining whether it was liable as an operator under CERCLA for its relationship with plaintiff's aircraft manufacturing facility during and after WWII. 2010 WL 2400388, at *6-7, 23. After recognizing that "[t]he United States Defendants' role in the operations of [plaintiff's aircraft manufacturing facility] was limited to purchasing aircraft parts from the company and conducting periodic inspections to ensure that the site was maintained in compliance with industry standards," the district court concluded that "[t]he United States Defendants did not manage, direct, or conduct any of the day-to-day operations or manage, direct, or conduct any activities that had to do with the leakage or disposal of hazardous wastes" at the facility. *Id.* at 24. As a result, Judge Thompson found that the government was not an operator under either *Bestfoods* or *FMC. Id.* On appeal, the Third Circuit stated, "we agree with the great majority of the District Court's comprehensive and thoughtful consideration of this complex case, and will affirm its judgment in all respects save two" (neither of which related to the district court's operator liability analysis). *Litgo*, 725 F.3d at 399.

refineries' waste leakage, disposal, or environmental compliance." *Id.* at 524. "Direct and specific federal government involvement in the waste-disposal matters at issue is required." *Id.* at 523.

In *Exxon*, Exxon sued the United States for "operating" its oil refinery to produce critical war material, high-octane aviation gas ("avgas"), during WWII and the Korean War. *Id.* at 490, 494. The government set price ceilings on avgas, "control[led] the type and amount of crude oil and other raw materials sent to the two refineries," "directed refineries to blend avgas in a way that would allow increased overall production even if that method would reduce an individual refinery's yield," and "directly reimbursed the refineries for any extraordinary expenditures they undertook." *Id.* at 495, 496, 498. The government also "had the authority to require oil companies to produce certain goods," and could "seize the refineries if the companies refused." *Id.* at 495. The government seized one of Exxon's refineries in Ingleside, Texas, but did not seize either of the refineries at issue. *Id.* The Southern District of Texas found that because "[n]othing in the record indicates that the [the government and oil companies at issue] negotiated or specified how the oil companies would manage waste disposal at the refineries," the government was not liable as an operator under *Bestfoods*. *Id.* at 525, 530.

The District of Idaho came to a similar conclusion in *Coeur D'Alene Tribe*. 280 F. Supp. 2d at 1130. In *Coeur D'Alene*, mining companies asserted that the government was an operator of their mining and milling facilities before and during WWII. *Id.* at 1125. The Court recognized that "[t]he mining companies did voluntarily mine and mill during the war," and they "did turn a profit during World War II, but the profit was significantly reduced by the government's control over production, prices and operating costs." *Id.* at 1128. The government controlled "the price for the product via the premium price plan and quota system," and also controlled the "wages for mining and non-mining personnel" and "the length of the work week." *Id.* at 1127. The

government offered soldiers "deferments from military service to work in the [facilities]," and restricted employees from taking outside employment. *Id.*

The facilities needed government approval for making capital improvements, purchasing equipment, and purchasing chemicals. *Id.* They also had to submit monthly operating reports to the government. *Id.* The government was also in control of security at the facilities and "required changes" to comply with their security demands. *Id.* If certain conditions were not complied with, the government threatened seizure of operations. *Id.* The government was also aware of the toxic tailings that the facilities generated and of the disposal method for such tailings. *Id.* However, the government did not make any "day-to-day decisions regarding the operation of the flumes and chutes" transporting and disposing of the tailings in the waterways. *Id.* at 1128.

In conducting its operator liability analysis, the court in *Coeur D'Alene* first distinguished its case from *FMC*, finding the following to be "significant differences" in the matters:

> In the present case, the mining companies maintained actual control over the mines and mills; the mining companies hired and fired and supervised employees; the mining companies voluntarily decided to mine for metals and to participate in the premium price plans and quotas; the mining companies owned the equipment used in the mines and mills; the government set the price for metals, but did not control who could purchase the metals at the given prices; and the mining companies controlled the mechanisms creating the tailings and the disposal of the tailings.

*Id.* at 1130. Applying the *Bestfoods* standard, the *Coeur D'Alene* court found that "the government did not manage, direct or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decision about compliance with environmental regulations," and therefore that the government was not liable as an operator under CERCLA. *Id.* at 1129.

Additionally, courts in the District of New Jersey has recognized that mere recommendations by the government that can be, and are, disregarded are insufficient for operator liability. *United States v. Cornell-Dubilier Elecs., Inc.*, No. CIV.A. 12-5407 JLL, 2014 WL 4978635, at *8 (D.N.J. Oct. 3, 2014). In *Cornell-Dubliner*, "[g]overnment agents submitted recommendations to [the polluting facility's] management for the purpose of improving efficiency and security at the facility," however "there [wa]s no evidence that these recommendations were ever carried out, and no evidence that the [g]overnment's recommendations were treated as imperatives." *Id.* Accordingly, Judge Linares concluded that "the record indicates that the [g]overnment never exercised the kind of control over the [polluting] facility that is typically associated with operator liability" under CERCLA. *Id.*

Here, the Government's wartime, regulatory control over NPR's chromium chemical facility does not support a finding of operator liability. The Government controlled the supply and price of NPR's raw material as well as the price of its finished product. Pl. SOMF ¶¶ 23, 27, 39, 43. The government participated in one of NPR's labor disputes, once visited NPR's facility, and had the power to seize the facility due to labor unrest. *Id.* ¶¶ 68, 73, 75. The Government engaged in discussions with NPR about how to increase production, and discussed the possibility of a subsidy. Def. RESP ¶ 13.

However, the Government never directly managed or conducted NPR's operations regarding pollution – either the release and disposal of hazardous substances or the implementation of environmental remediation. The Government never entered into the proposed sludge-purchase subsidy. It never seized the plant. It never stationed its own employee at the facility or placed him or her in control of waste-producing operations, waste disposal, or environmental remediation. The Government never demanded a certain type of production process be utilized or specified how

27

the plant had to dispose of its waste. All of the Government's actions in relation to NPR's plant are consistent with general wartime influence over an industry – not control over NPR's pollution-specific activities.

While the Court is applying the *Bestfoods* standard, the Court also disagrees with Plaintiff's claim that the current facts are "almost identical" to those in *FMC*. Pl. Opp'n at 31. To be sure, certain facts are the same or very similar. Both cases concern the Government's far-reaching industry oversight during WWII, the Government's control of the supply and price of raw materials, the Government's control over the distribution and price of the finished product, the Government's awareness that hazardous substances were a necessary byproduct of production, and the Government's authority to seize non-complying plants. On the other hand, there are also material differences between the two cases. Critically, unlike in *FMC*, the Government did not require NPR to convert its plant to produce a different product. The Government also did not supply NPR with government equipment and machinery, much less contract with a third party to manufacture the equipment and then maintain supervisory oversight as to the equipment's installation. Here, the Government did not build complementary facilities next to the Site. The Government was also much less involved in labor decisions at the NPR plant as the Government did not actively participating in the management or supervision of the labor force. The Government did not have a full-time representative at NPR's plant to address manpower, housing, and community services issues. The Government did not have a representative at NPR with authority to promulgate rules governing all operations. Therefore, the Court finds the current case factually distinguishable from *FMC*.

Plaintiff also relies heavily on the Government's involvement in discussions about how to increase production at NPR's facility. *E.g.*, Pl. SOMF ¶ 13. However, as was the case in *Cornell-*

*Dubliner*, these discussions only amounted to the Government *recommending* or *proposing* what processes NPR could implement; NPR was still free to implement these processes or reject them. Def. RESP ¶ 13. NPR remained in control of its facility and the decision-making regarding how to produce chromium chemicals and how to dispose of its waste. *Id.* Indeed, NPR was free to reject the Government's proposals and, on occasion, did so, such as its rejection of the higher-grade ore subsidy.

For the foregoing reasons, the Court finds that there are no genuine issues of material fact precluding summary judgment and that the Government is not liable to Plaintiff as an operator of NPR's Site under *Bestfoods*.

### 3. Arranger Liability

"[U]nder the plain language of the [CERCLA] statute, an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance." *Burlington*, 556 U.S. at 611. "[K]nowledge alone is insufficient." *Burlington*, 556 U.S. at 612. "Ownership or possession of the hazardous substance must be demonstrated." *Morton Int'l, Inc. v. A.E. Staley Mfg. Co.*, 343 F.3d 669, 677 (3d Cir. 2003). Further, arranger liability does not attach "when the disposal occurs as a peripheral result of the legitimate sale of an unused, useful product." *Burlington*, 556 U.S. at 611. In addition to ownership or possession, the arranger also must have "either control over the process that results in a release of hazardous waste or knowledge that such a release will occur during the process." *Morton*, 343 F.3d at 677.

Here, the Government is not an arranger because it never took ownership or control over the sludge. As discussed above, the parties discussed a subsidy whereby the Government would purchase and take title to NPR's toxic sludge, but the Government never did so. D.E. 152-23, Ex.

95.  Plaintiff has produced no evidence that the Government took ownership of the sludge in any capacity.  This alone is enough to defeat arranger liability.

In addition, the Government did not have control over the process that resulted in a release of hazardous waste at NPR's facility.  The Government made proposals as to how NPR should conduct its processing so as to maximize output, but the decision to implement these proposals was ultimately left to NPR.  Further, even if the Government was aware that a certain process would increase the amount of pollution, knowledge alone is insufficient for arranger lability.

Therefore, there are no genuine issues of material fact and the Court finds that the Government is entitled to summary judgment on Plaintiff's arranger theory of liability.

## B.  RCRA

"RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste."  *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996). Unlike CERCLA, "RCRA is not principally designed to effectuate the cleanup of toxic waste sites or to compensate those who have attended to the remediation of environmental hazards."  *Id.* "RCRA's primary purpose, rather, is to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the *present and future threat* to human health and the environment.'"  *Id.* (citing 42 U.S.C. § 6902(b)) (emphasis added).  Thus, under RCRA, district courts do not have the authority to award a plaintiff "costs for past cleanup efforts."  *United States v. Lane Labs-USA Inc.*, 427 F.3d 219, 230 (3d Cir. 2005) (citing *Meghrig*, 516 U.S. at 484).  Instead, RCRA authorizes courts to issue injunctions to alleviate imminent harms posed to human health and the environment, and "costs of litigation (including reasonable attorney and expert witness fees) to the prevailing or

substantially prevailing party, whenever the court determines such an award is appropriate." *Litgo*, 725 F.3d at 393.

RCRA provides, in relevant part, as follows:

> [A]ny person may commence a civil action on his own behalf . . . against any person, including the United States and any other governmental instrumentality or agency, . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment[.]

42 U.S.C. § 6972(a)(1)(B). To prevail on its RCRA claim, a plaintiff must demonstrate that

> (1) that the defendant is a person, including, but not limited to, one who was or is a generator or transporter of solid or hazardous waste or one who was or is an owner or operator of a solid or hazardous waste treatment, storage, or disposal facility; (2) that the defendant has contributed to or is contributing to the handling, storage, treatment, transportation, or disposal of solid or hazardous waste; and (3) that the solid or hazardous waste may present an imminent and substantial endangerment to health or the environment.

*Interfaith Cmty Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 258 (3d Cir. 2005). "[T]he plain language of [this provision] makes clear that liability should only be imposed on those who actively manage or dispose solid or hazardous waste." *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 263 F. Supp. 2d 796, 831 (D.N.J. 2003), *aff'd*, 399 F.3d 248 (3d Cir. 2005).

As discussed above, the Government was not an operator of the Site and never actively managed or disposed of hazardous waste at the Site. There are no genuine issues of material fact and the Government is entitled to summary judgment on Plaintiff's RCRA claim.

## VI. CONCLUSION

For the reasons set forth above, Plaintiff's motion for summary judgment is denied, and Defendants' motion for summary judgment is granted. An appropriate Order accompanies this Opinion.

Date: November 26, 2018

John Michael Vazquez, U.S.D.J.